1

2

3          **UNITED STATES DISTRICT COURT**

4          **EASTERN DISTRICT OF CALIFORNIA**

5

6    **NETAFIM IRRIGATION, INC.,**               **CASE NO. 1:21-cv-00540-AWI-EPG**

7                    **Plaintiff,**

8          **v.**                                **ORDER ON DEFENDANTS' MOTION
                                                  TO DISMISS**

9    **JAIN IRRIGATION, INC., JAIN**
     **DISTRIBUTION HOLDINGS, INC.,**
10   **IRRIGATION DESIGN &**                      (Doc. No. 15)
     **CONSTRUCTION, LLC, and AGRI-**
11   **VALLEY IRRIGATION, LLC,**

12                    **Defendants.**

13

14

15          Plaintiff Netafim Irrigation, Inc., alleges that Defendants Jain Irrigation, Inc., Jain

16   Distribution Holdings, Inc., Irrigation Design & Construction, LLC, and Agri-Valley Irrigation,

17   LLC, engaged in anticompetitive market behavior when the Jain entities acquired majority shares

18   of the latter two companies.  Netafim also alleges that all four Defendants are liable for false

19   advertising that caused it damage.  Defendants now move to dismiss each of Netafim's claims.

20   For the reasons that follow, the Court will grant that motion in part and deny it in part.

21

22                                  **BACKGROUND**

23          Netafim's case is centered on the micro-irrigation industry in Central California.  Doc. No.

24   1 ("Compl."), ¶ 1.[1]  Micro-irrigation is a comparatively cost-effective and sustainable form of

25   irrigation that delivers water and nutrients directly to the root systems of crops.  Id., ¶ 15.  The

26

27   ───────────────────────

28   [1] While others will be cited and discussed in greater detail below, the following factual allegations drawn from the
     complaint provide relevant context for resolving Defendants' motion.  The Court construes these factual allegations as
     true.  See Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015).

micro-irrigation industry consists of three levels:  (1) manufacturers that produce equipment for micro-irrigation systems; (2) local design firms that work with growers to customize, install, and maintain micro-irrigation systems; and (3) growers that purchase and use micro-irrigation systems on their farms.  Id., ¶ 16.  Manufacturers depend on local design firms to sell products to growers, as the local design firms are able to design micro-irrigation systems that meets the needs of particular growers' fields and then install and maintain those systems.  Id., ¶ 17.  As part of these relationships, manufacturers invest time and money to ensure the local design firms are knowledgeable about the manufacturers' product lines and prices—this often involves manufacturers' provision to local design firms of non-public pricing and individualized quotes for projects.  Id., ¶ 19.  These relationships notwithstanding, local design firms have historically worked with multiple manufacturers in order to offer growers the most suitable products at the best prices.  Id., ¶ 18.  Likewise, local design firms also compete to win growers' business based on the price, quality, and array of equipment they can offer.  Id.

Netafim manufactures micro-irrigation equipment and is based in Fresno, California.  Id., ¶¶ 1, 3.  Jain Irrigation is also based in Fresno and serves as Netafim's largest competitor in micro-irrigation equipment manufacturing.  Id., ¶¶ 1, 4.  Irrigation Design and Agri-Valley are micro-irrigation design firms based in Patterson, California, and Fresno, respectively.  Id., ¶¶ 6–7.

In 2016, Netafim had approximately $65 million in sales in Central California, which included around $9 million in sales through Irrigation Design and Agri-Valley.  Id., ¶¶ 20, 23–28.  Jain, on the other hand, had approximately $25 million in Central Valley sales in 2016.  Id., ¶ 21.  Meanwhile, Irrigation Design and Agri-Valley had combined revenues of $113 million in 2016.  Id., ¶ 22.  At that time, Irrigation Design and Agri-Valley were the two largest micro-irrigation design firms in Central California.  Id.

In 2017, Jain Distribution—a Fresno-based sister company of Jain Irrigation—acquired an 80% interest in both Irrigation Design and Agri-Valley.  Id., ¶¶ 5–7, 29.[2]  After the acquisition,

---

[2] While the complaint explains that Jain Distribution is the holding company for Irrigation Design and Agri-Valley—and that both Jain Distribution and Jain Irrigation are wholly owned subsidiaries of Jain Irrigation Limited, "an Indian multi-national conglomerate" that has not itself been sued in this action—Netafim's allegations describing the acquisition singly identify Jain Irrigation as the active Jain participant.  Compl., ¶¶ 1, 4–5, 29–38.  Nonetheless, the

1  Netafim terminated its relationships with Irrigation Design and Agri-Valley.  Id., ¶ 31.  Given the

2  control that Irrigation Design and Agri-Valley had over access to growers in local markets in

3  Central California, once these relationships were terminated, Netafim was unable to match its pre-

4  acquisition sales figures by using other design firms.  Id., ¶¶ 35–36.  In turn, Netafim's equipment

5  sales declined in 2017 and were still depressed through 2020.  Id., ¶¶ 36–38.

6        Netafim filed its complaint on March 29, 2021.[3]  Therein, it alleges that Jain's acquisition

7  of Irrigation Design and Agri-Valley reduced competition in the sale of micro-irrigation

8  equipment in local markets across Central California.  Id., ¶ 1.  On this theory, Netafim raises

9  causes of action under the Sherman Antitrust Act, 15 U.S.C. § 1, and the Clayton Antitrust Act, 15

10  U.S.C. § 18.  Compl., ¶¶ 79–85, 86–92.  Netafim also brings a cause of action under the Lanham

11  Act, 15 U.S.C. § 1125, which is based on allegations that Defendants engaged in an adverse

12  campaign of false advertisements following the acquisition.  Compl., ¶¶ 93–102.  Netafim seeks

13  equitable relief and millions of dollars in damages for its claims.  Id., ¶ 1, Prayer for Relief.

14        Defendants now move to dismiss the complaint in full under Federal Rule of Civil

15  Procedure 12(b)(6).  Doc. No. 15.  Netafim has filed its opposition, to which Defendants have

16  replied.  Doc. Nos. 17 & 18.

17

18                                  **LEGAL STANDARD**

19        Under Federal Rule of Civil Procedure 12(b)(6), a cause of action may be dismissed where

20  a plaintiff fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

21  Dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the

22  absence of sufficient facts alleged under a cognizable legal theory.  Conservation Force v. Salazar,

23  646 F.3d 1240, 1242 (9th Cir. 2011); Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116,

24  1121–22 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion for failure to allege sufficient facts, a

25  parties' briefing on Defendants' motion does not recognize a distinction between the separate Jain entities.  Thus, for

26  purposes of this order, the Court will adopt that practice as well.

27  [3] As acknowledged in the complaint and Defendants' unopposed request for judicial notice, the parties here have been
   involved in other adversarial litigation in federal and state court.  Compl., ¶¶ 56–58; Doc. No. 15-2.  See Jain
   Irrigation, Inc. v. Netafim Irrigation, Inc., 386 F. Supp. 3d 1308 (E.D. Cal. 2019); Jain Irrigation, Inc. v. Netafim

28  Irrigation, Inc., No. 37-2019-00035422-CU-AT-CTL (Cal. Super. Ct. filed July 8, 2019).  Notwithstanding this notice,
   the Court's resolution of this motion is not affected by these separate proceedings.

complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Compliance with this rule ensures that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (internal marks omitted).  Under this standard, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570) (internal marks omitted).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Id. at 663.

In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  Mollett, 795 F.3d at 1065; Marceau v. Blackfeet Hous. Auth., 540 F.3d 916, 919 (9th Cir. 2008).  But the court is "not 'required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.'" Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013) (quoted source omitted).  Complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 678; Johnson v. Fed. Home Loan Mortg. Corp., 793 F.3d 1005, 1008 (9th Cir. 2015).  Rather, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (quoting Iqbal, 556 U.S. at 678).  If a motion to dismiss is granted, the court "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Henry A. v Willden, 678 F.3d 991, 1005 (9th Cir. 2012) (quoted source and internal marks omitted).

## DISCUSSION

In their motion, Defendants argue that all three of Netafim's claims should be dismissed.

1   The Court will start with Defendants' challenges to the antitrust claims, and then turn to the

2   parties' disputes regarding the false advertising claim.

3

4           **A.      Antitrust claims**

5           Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the

6   form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.

7   Section 7 of the Clayton Antitrust Act prohibits mergers and acquisitions "in any line of

8   commerce" in which the effect "may be substantially to lessen competition, or to tend to create a

9   monopoly."  15 U.S.C. § 18.

10          Mirroring these provisions, Netafim uses its first two claims to allege that Jain's

11  acquisition of Irrigation Design and Agri-Valley was an unreasonable restraint of trade (in

12  violation of the Sherman Act) that substantially lessened competition in the markets for micro-

13  irrigation equipment and micro-irrigation design services in local markets throughout Central

14  California (in violation of the Clayton Act).  Compl., ¶¶ 81, 88.  Defendants now challenge both

15  claims, considered together, on four threshold grounds.[4]

16          Defendants' first two challenges go to Netafim's pleading of an antitrust injury, which is

17  itself a necessary predicate for possessing the unique antitrust standing that is required for claims

18  under the Sherman and Clayton Acts.  <u>Somers v. Apple, Inc.</u>, 729 F.3d 953, 963 (9th Cir. 2013);

19  <u>Glen Holly Ent., Inc. v. Tektronix Inc.</u>, 352 F.3d 367, 371 (9th Cir. 2003).  Broadly, antitrust

20  injury is "injury of the type the antitrust laws were intended to prevent and that flows from that

21  which makes defendants' acts unlawful."  <u>Somers</u>, 729 F.3d at 963 (quoted source omitted).  With

22  their dismissal motion, Defendants argue that Netafim has not sufficiently pleaded that their

23  ────────────────────

24  [4] Defendants also assert that Netafim's Clayton Act claim against Irrigation Design and Agri-Valley must fail as the
    language of Section 7 only applies to acquirers of assets, not sellers.  Netafim does not respond to this assertion.
    Defendants are correct as to the language of the Clayton Act provision.  15 U.S.C. § 18 (stating in multiple contexts

25  that "no person shall acquire").  But the Ninth Circuit has also recognized that sellers may be joined in a Section 7
    claim if the court requires jurisdiction over both the selling and acquiring entities to fashion equitable relief.  <u>United</u>

26  <u>States v. Coca-Cola Bottling Co. of L.A.</u>, 575 F.2d 222, 230–31 (9th Cir. 1978) (discussing Section 15 of the Clayton
    Act, which is codified at 15 U.S.C. § 25).  For purposes of its Section 7 claim, Netafim seeks both equitable relief and

27  damages from all Defendants.  Compl., Prayer for Relief.  Recognizing the statutory language and the controlling
    precedent, the Court will dismiss that claim as to Irrigation Design and Agri-Valley with respect to damages.

28  <u>Gerlinger v. Amazon.Com, Inc.</u>, 311 F. Supp. 2d 838, 852 (N.D. Cal. 2004); <u>Fricke-Parks Press, Inc. v. Fang</u>, 149 F.
    Supp. 2d 1175, 1186 (N.D. Cal. 2001).

1    conduct caused any injury, much less one that antitrust laws are meant to deter.

2         Defendants' latter two challenges go to the sufficiency of Netafim's allegations defining a

3    relevant market and Defendants' power within that defined market.  Allegations of this kind are

4    also generally required for both Sherman and Clayton Act claims.  Brown Shoe Co. v. United

5    States, 370 U.S. 294, 324, 343 (1962); Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038,

6    1044 (9th Cir. 2008).

7         The Court will consider the market-related challenges first, as they necessarily color the

8    discussion of the antitrust injury disputes.  See Fed. Trade Comm'n v. Qualcomm Inc., 969 F.3d

9    974, 992 (9th Cir. 2020) ("[I]n assessing alleged antitrust injuries, courts must focus on

10   anticompetitive effects 'in the market where competition is [allegedly] being restrained.'  'Parties

11   whose injuries, though flowing from that which makes the defendant's conduct unlawful, are

12   experienced in another market do not suffer antitrust injury.'" (quoted source omitted)).

13

14                    1.    Relevant market

15        "A threshold step in any antitrust case is to accurately define the relevant market, which

16   refers to 'the area of effective competition.'"  Qualcomm Inc., 969 F.3d at 992 (quoted source

17   omitted); see also Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995) ("[A]

18   'market' is the group of sellers or producers who have the 'actual or potential ability to deprive

19   each other of significant levels of business.'" (quoted source omitted)).  Setting the relevant

20   market boundaries is a critical first step as it enables the court to assess issues regarding market

21   share, the defendant's ability to lessen or destroy competition, and the alleged antitrust injury.

22   Qualcomm Inc., 969 F.3d at 992; Rebel Oil Co., 51 F.3d at 1434.

23        To define a relevant market, the plaintiff must identify both a product market and a

24   geographic market.  Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1120 (9th Cir. 2018).  The product

25   market "includes the pool of goods or services that enjoy reasonable interchangeability of use and

26   cross-elasticity of demand."  Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1063 (9th Cir. 2001)

27   (quoted source omitted).  In other words, based on the product market, the relevant market will

28   "include 'the group or groups of sellers or producers who have actual or potential ability to

1   deprive each other of significant levels of business.'"  Newcal Indus., Inc., 513 F.3d at 1045

2   (quoted source omitted).  In so far as it is defined geographically, the relevant market is the "area

3   of effective competition . . . where buyers can turn for alternate sources of supply."  Morgan,

4   Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1490 (9th Cir. 1991) (quoted source

5   and internal marks omitted).

6          Before turning to Netafim's allegations, the Court notes that relevant market

7   determinations are typically fact-intensive, with actual "inquiry into the 'commercial realities'

8   faced by consumers."  High Tech. Careers v. San Jose Mercury News, 996 F.2d 987, 990 (9th Cir.

9   1993) (quoted source omitted).  This often enables market-defining allegations to survive scrutiny

10  under Rule 12(b)(6).  Newcal Indus., Inc., 513 F.3d at 1045.  Nonetheless, a relevant market

11  definition still must be plausible and without a fatal legal defect that is apparent from the face of

12  the complaint.  Id.

13         In the complaint, Netafim defines separate product markets for micro-irrigation equipment

14  and micro-irrigation design services, and geographic markets as the local areas where micro-

15  irrigation design services are demanded by growers and provided by design firms.  Compl., ¶¶ 59–

16  65.

17         In their motion, Defendants primarily take issue with how the product markets interact or

18  fail to interact with the geographic markets.  First, Defendants argue that Netafim has not actually

19  alleged a geographic market that corresponds to the equipment product market.  Second, regarding

20  the design services product market, Defendants assert that Netafim's allegations are conclusory

21  and improperly based on cherrypicked counties and zip codes that show a significant

22  anticompetitive effect.

23         The Court rejects the first argument.  As noted above, to properly define a relevant market,

24  a product market must be paired with a geographic market.  Hicks, 897 F.3d at 1120.  Yet,

25  Netafim's broader allegations establish that its geographic markets definition of local areas where

26  micro-irrigation design services are demanded and provided necessarily corresponds to the

27  product markets for both those services and micro-irrigation equipment.  Namely, according to the

28  complaint, Jain's acquisition of the design firms disrupted competition in the micro-irrigation

7

industry by reducing other manufacturers' access to growers.  This theory of harm is itself

predicated on Netafim's description of a three-tier micro-irrigation industry where design firms

function as the necessary intermediary between manufacturers of micro-irrigation equipment and

growers who purchase that equipment as part of their micro-irrigation systems.  Compl., ¶¶ 16–19.

In other words, Netafim's allegations explain that producers (manufacturers) and consumers

(growers) of micro-irrigation equipment are mutually dependent on the services of micro-

irrigation design firms.  Through this lens, it is clear that the market for those design services

overlap with the market for micro-irrigation equipment, as the latter is being sold through the

former.  This conclusion aligns with Netafim's product market allegations.  Id., ¶¶ 59–60.  It also

allows for a reasonable inference (if one is even needed) that the relevant geographic markets for

selling that equipment are the same geographic markets for selling those design services.

　　　　Defendants' second argument is aimed at the sufficiency of the relevant geographic market

allegations.  In general terms, the relevant geographic market is the "area of effective competition"

where buyers could practically turn for alternative sources of supply if a seller attempted to

exercise market power by increasing price or decreasing quality.  Tanaka, 252 F.3d at 1063

(quoted source omitted).[5]  A geographic market need not be alleged or proved with "scientific

precision," nor must it be defined "by metes and bounds as a surveyor would lay off a plot of

ground."  United States v. Conn. Nat'l Bank, 418 U.S. 656, 669 (1974); United States v. Pabst

Brewing Co., 384 U.S. 546, 549 (1966).  Rather, the complaint need only include sufficient

information to present a relevant geographic market that is facially sustainable.  Newcal Indus.,

Inc., 513 F.3d at 1045; see also Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1336 (11th Cir.

2010) ("[A]ntitrust plaintiffs still must present enough information in their complaint to plausibly

suggest the contours of the relevant geographic and product markets.").

---

[5] This describes a monopoly market situation, where the seller holds market power.  If market power is instead possessed by a buyer or group of buyers, the market situation is alternatively described as a monopsony.  United States v. Syufy Enters., 903 F.2d 659, 663 & n.4 (9th Cir. 1990).  These similar yet unique forms of market power are generally treated as equivalent for purposes of antitrust law.  Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 321–22 (2007).  In the context of a monopsony, however, the relevant geographic market definition captures the area in which sellers are able to turn to other buyers as reasonably good substitutes.  Todd v. Exxon Corp., 275 F.3d 191, 201–02 (2d Cir. 2001) (explaining generally how market definitions are affected by different market situations).

As noted above, Netafim defines the relevant geographic markets as the "local geographic markets where growers demand design services and where design firms provide design services." Compl., ¶ 61.  Netafim alleges that these local geographic markets arise from growers' demand for local service.  Id., ¶ 62.  According to Netafim, "[e]very micro-irrigation system must be tailored to the needs of a particular grower in a particular location for a particular field and crop," which in turn leads growers to seek design services from design firms with a "local office" and "expertise with local field and crop factors that influence the design of micro-irrigation systems."  Id.  In response to this demand, Netafim continues, design firms operate "locally" by maintaining "local stores to serve growers in these local markets."  Id., ¶ 63.  "Each store serves growers located near the store.  Design firms have local employees and rely on local labor forces and local equipment to design and install systems in each area."  Id.  Netafim also explain that Defendants' own operations "illustrate that the relevant geographic markets are local."  Id., ¶ 64.  Netafim supports this allegation by listing fourteen storefronts that Irrigation Design and Agri-Valley maintain in certain counties and zip codes across Central California.  Id., ¶¶ 24–25.  Netafim alleges that this quantity of separate physical locations indicates that "design services are provided in local markets."  Id., ¶ 64.  Netafim adds that Irrigation Design and Agri-Valley's market dominance in those counties and zip codes—as exhibited by Netafim's sales figures through the design firms at these locations and its dramatic drop in sales following the acquisition—also "confirms that the [relevant] markets are local."  Id., ¶¶ 64–65.

Much of Defendants' argument focuses on Netafim's enumeration of "cherrypicked" and "gerrymandered" counties and zip codes in the complaint.[6]  Netafim responds that its pleading does not define the relevant geographic markets by county lines and zip code borders, and that these geographic markers were added to the complaint only to more clearly illustrate the control that Defendants had over access to growers in those local areas.  This reading, however, conflicts with the following allegation:  "The local geographic markets where Netafim alleges that

---

[6] Defendants ask the Court to take judicial notice of a map of Central California that identifies the twelve zip codes that are referenced in Netafim's allegations.  Doc. No. 15-2.  Although maps are frequently a subject of judicial notice, the Court resolves this portion of Defendants' motion without need for notice of this particular map.

1  [Irrigation Design and Agri-Valley] had a dominant share are listed in Tables 1 and 2, above, and

2  include Merced, Solano, and Stanislaus Counties, and the zip codes of 93292, 93620, 93622,

3  93624, 93722, 95012, 95206, 95236, 95341, 95360, 95363, and 95620." Compl., ¶ 61.  And to the

4  extent Netafim has alleged that the relevant geographic markets are at least in part defined by the

5  boundaries of particular counties and zip codes, it has not plausibly explained in the complaint

6  why these lines are appropriately drawn.  Rather, this case aligns with other instances where courts

7  have rejected geographic market definitions based on political and administrative boundaries.  Cf.

8  Concord Assocs., L.P. v. Ent. Props. Tr., 817 F.3d 46, 53–54 (2d Cir. 2016) (rejecting a gambling-

9  related market based primarily on four New York counties while excluding nearby gambling

10 markets in Connecticut, Pennsylvania, and New Jersey); Nicolosi Distrib., Inc. v. FinishMaster,

11 Inc., No. 18-cv-03587-BLF, 2019 WL 1560460, at *5 (N.D. Cal. Apr. 10, 2019) (rejecting a

12 geographic market based on county lines where no plausible explanation for excluding other

13 neighboring counties).  Thus, in so far as Netafim has defined the relevant geographic markets

14 based on certain counties and zip codes, its current allegations cannot stand.

15       Yet, the Court also recognizes that much of Netafim's geographic market pleading is based

16 on something other than the enumerated counties and zip codes.  This is the tack Netafim takes in

17 opposition to Defendants' motion when it urges the Court to instead focus on its allegations

18 explaining that "the relevant geographic markets are the local areas around [the design firms']

19 retail stores."  While this contention aligns with other allegations in the complaint, neither those

20 allegations nor Netafim's opposition explain how to implement this separate definition without

21 running into obvious problems.  For instance, consider a hypothetical where two design firm

22 storefronts are located within a mile of each other, one maintained by Irrigation Design and the

23 other maintained by a non-defendant design firm.  Under Netafim's proposal, each storefront gives

24 rise to a unique geographic market consisting of the surrounding local area.  Yet, nothing in the

25 complaint (nor Netafim's argument here) suggests that growers in this area could not alternate

26 between the two stores if one of the design firms increased its prices.  Defendants present a similar

27 hypothetical in their motion, with argument that design firms located a block apart would exist in

28 different markets simply because they fell within different zip codes.  Netafim responded with

1   explanation that "two stores a block away from each other presumably would be in the same local

2   market."  This may have defeated Defendants' zip code theory, but with no other limiting

3   principles in play, it also conflicts with Netafim's suggestion that each storefront gives rise to a

4   geographic market.

5          At bottom, the Court can reasonably infer from the complaint that the defined "local

6   geographic markets" are circumscribed areas in Central California that surround physical

7   storefronts maintained by micro-irrigation design firms.  This, according to Netafim's pleading, is

8   where design services are sought and provided, and growers would not leave these areas for those

9   design services (and ultimately micro-irrigation equipment) if subjected to a small price increase.

10  Without reasonably concrete geographic terms, however, the complaint otherwise presents an

11  open-ended approach to decipher the amorphous phrase "local geographic markets."  To that end,

12  the Court finds as telling how the allegations here stand in contrast to other cases that have

13  involved properly alleged "local" geographic markets.  For instance, in <u>Sentry Data Systems, Inc.</u>

14  <u>v. CVS Health</u>, 379 F. Supp. 3d 1320, 1329 (S.D. Fla. 2019), the plaintiff alleged local geographic

15  markets based on twenty-two core-based statistical areas in which the defendant had a 30% or

16  greater share of contract pharmacy locations.  Similarly, <u>Sidibe v. Sutter Health</u>, 667 F. App'x

17  641, 642–43 (9th Cir. 2016), involved allegations of local geographic markets for the sale of

18  inpatient hospital services based on hospital service areas as defined in a publication produced by

19  healthcare researchers.  Likewise, in <u>Universal Hospital Services, Inc. v. Hill-Rom Holdings, Inc.</u>,

20  No. SA-15-CA-32-FB, 2015 WL 6994438, at *2 (W.D. Tex. Oct. 15, 2015), the plaintiff defined

21  regional geographic sub-markets for time-sensitive medical equipment rentals as a circle with a

22  ninety-mile radius centered on regional distribution centers owned and operated by the parties.

23  And in <u>It's My Party, Inc. v. Live Nation, Inc.</u>, 811 F.3d 676, 681–82 (4th Cir. 2016), the court

24  determined that the instant concert promotion dispute involved the local market of the

25  Washington-Baltimore area.  The market definition in each of these cases came with limiting

26  principles of a kind that are not present here.[7]

27  _____

28  [7] The same is true regarding Netafim's own case law authority.  <u>See</u> <u>Saint Alphonsus Med. Ctr.-Nampa Inc. v. St.</u>
    <u>Luke's Health Sys., Ltd.</u>, 778 F.3d 775, 783–85 (9th Cir. 2015) (relevant geographic market of the city of Nampa);

While the bar at this stage does not demand scientific precision or metes and bounds, some certainty is required to ensure the phrase "local geographic markets" provides enough notice to be able to proceed.  See Orchard Supply Hardware LLC v. Home Depot USA, Inc., 939 F. Supp. 2d 1002, 1010 (N.D. Cal. 2013) ("Plaintiff's definition of the relevant geographic market—'various regional markets in California and Oregon where Orchard and other retail sellers of power tools compete against one another'—is vague and conclusory.").  Because the complaint fails in this regard, the Court will dismiss the claims on this basis and provide Netafim with an opportunity to amend its pleading.

## 2.    Market power

Along with a relevant market definition, a plaintiff must plead that the defendant has power within that market.  Newcal Indus., Inc., 513 F.3d at 1052; Rick-Mik Enters., Inc. v. Equilon Enters. LLC, 532 F.3d 963, 972 (9th Cir. 2008).  Market power is the ability of a seller "to raise price and restrict output."  Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 464 (1992) (quoted sources and internal marks omitted); Rebel Oil Co., 51 F.3d at 1434; see also Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1118 (10th Cir. 2008) ("In a monopsony, the buyers have market power to decrease market demand for a product and thereby lower prices.").  Practically, "[m]arket power . . . is simply a way to assess whether the defendant's conduct has anticompetitive effects."  Staley v. Gilead Scis., Inc., 446 F. Supp. 3d 578, 616 (N.D. Cal. 2020).  Similar to the relevant market definition, ascertaining market power is fact-intensive and case-specific; thus, market power allegations often survive scrutiny under Rule 12(b)(6).  Eastman Kodak Co., 504 U.S. at 466–67; Newcal Indus., Inc., 513 F.3d at 1052.

As to the nuts and bolts, market power can be proved through direct or circumstantial evidence, and market power allegations should generally track at least one of these routes.  Rebel Oil Co., 51 F.3d at 1434.  The first route requires direct proof of an injury to competition that a competitor with market power could inflict, such as evidence showing restricted output and supra-

Movie 1 & 2 v. United Artists Commc'ns, Inc., 909 F.2d 1245, 1248 (9th Cir. 1990) (relevant geographic market of the greater Santa Cruz area); United States v. Trib. Publ'g Co., No. CV 16-01822-AB (PJWx), 2016 WL 2989488, at *3–4 (C.D. Cal. Mar. 18, 2016) (relevant geographic market of Orange County and Riverside County).

competitive prices.  Id.  In contrast, plaintiffs more commonly present a circumstantial case, which demands a relevant market definition and evidence showing that (1) the defendant owns a dominant share of that market and (2) there are significant barriers to entry and existing competitors lack the capacity to increase their output in the short run.  Id.

A threshold problem emerges quickly.  Namely, before even considering Netafim's market power allegations, the Court recognizes its inability to fully assess them in light of the insufficient allegations regarding the relevant geographic market.  Id. ("Without a definition of the relevant market, it is impossible to determine market share.").  Even so, there still exists value in sizing up the market power allegations at this stage so as to offer guidance moving forward.[8]

In the complaint, Netafim first describes the micro-irrigation equipment market in Central California as being worth approximately $225 million at the time of the acquisition.  Compl., ¶ 66.  Of this pie, Netafim estimates its own share to have been 37% and Jain's to have been 11%, with the remainder left for small manufacturers who were also harmed by the acquisition.  Id.  Netafim acknowledges its inability to further pinpoint specific market shares within the "local geographic markets," but alleges that a similar breakdown is likely to apply at a local level.  Id.  Netafim then describes Irrigation Design and Agri-Valley as the two largest design firms in Central California.  Id., ¶ 67.  While noting the design firms' specific market shares vary across local markets depending on their physical locations and grower relationships, Netafim alleges that the pair "provide nearly all micro-irrigation design services in the regions surrounding their locations."  Id.  Netafim again points to the previously discussed enumeration of Irrigation Design and Agri-Valley storefronts, which include the percentages of Netafim's sales through the design firms at those locations in 2016 and 2017.  Id., ¶¶ 24–25, 67.

Through these allegations, Netafim does not exactly confirm whether it intends to prove market power through direct or circumstantial evidence.  Although its opposition brief focuses on the circumstantial angle, at this stage, Netafim might in fact still intend to try to do both.  And some groundwork has been laid for each kind of effort.  As for direct evidence, Netafim does not

---

[8] To that end, if it chooses to amend its relevant market allegations, Netafim may also amend its market power allegations as it deems necessary.

directly allege that the acquisition choked output, but it repeatedly references how the acquisition disrupted the channels for communication between manufacturers and growers.  Id., ¶¶ 74–75. And while supra-competitive prices are not identified, the complaint expressly states (albeit in conclusory fashion) that the acquisition led to increased prices for micro-irrigation equipment and design services.  Id., ¶¶ 77, 84, 91.

As for circumstantial evidence, the Court first notes that some parts of the equation, such as barriers to entry, are missing from or only weakly implied in the general market power allegations.  In contrast, Netafim's allegations regarding its sales through specific storefronts that were maintained by Irrigation Design and Agri-Valley lend some credence to the idea that the design firms owned strong market shares in certain locations.  Id., ¶¶ 24–25, 67.  On the other hand, the Court places some stock in Defendants' point that, based on figures in the complaint, Irrigation Design and Agri-Valley only accounted for about 14% of Netafim's overall sales in Central California in 2016, which raises some doubt regarding the design firms' market share.  Id., ¶¶ 20, 27–28.  The fact that Netafim has not alleged its own market share (or Jain's, for that matter) in the same local areas where the design firms maintained the aforementioned storefronts also adds uncertainty on this front.[9]  Also noteworthy is Netafim's allegation of Jain's 11% market share in Central California.  Id., ¶ 66.  What makes a given market share dominant necessarily varies from case to case, but some figures will be too low regardless of the particular circumstances presented.  Eleven percent almost assuredly fails to meet the bar.  Rebel Oil Co., 51 F.3d at 1438.  And yet, as Netafim emphasizes in its opposition, there remain reasonable counterarguments to Defendants' highlighting of these seemingly too-low figures.  For one, these numbers relate to Defendants' pre-acquisition position, and Netafim's entire case is based on the changes in the parties' positions following the acquisition.  Moreover, as to the 11% figure, Netafim's case does not appear to be premised on an isolated allegation of Jain's share in the market for micro-irrigation equipment.  Rather, Netafim seems to be alleging that Jain's position

[9] For instance, if the design firms accounted for 100% of Netafim's sales in a specific area, but Netafim's sales only accounted for a small fraction of the total sales in that area, the design firms would not possess dominant market shares based on their business with Netafim alone.

1  in that market *plus* its acquisition of Irrigation Design and Agri-Valley and their respective shares

2  in the market for micro-irrigation design services constitutes sufficient power in an interconnected

3  market based on the sale of micro-irrigation equipment to growers through micro-irrigation design

4  firms.  This matches the discussion above regarding the unified theory of harm on which Netafim

5  rests its antitrust claims.  Finally, in so far as Defendants contend Netafim's pleading is

6  insufficient because it lacks precise market share figures, some caution is in order.  See

7  ThermoLife Int'l LLC v. Neogenis Labs Inc., No. CV-18-02980-PHX-DWL, 2021 WL 1400818,

8  at *9 (D. Ariz. Apr. 14, 2021) (explaining that exact, percentage-based market share figures are

9  not necessarily needed to pass muster under Rule 12(b)(6)); Top Rank, Inc. v. Haymon, No. CV

10 15-4961-JFW (MRWx), 2015 WL 9948936, at *8 (C.D. Cal. Oct. 16, 2015) (same).  To provide

11 pinpoint accuracy, Netafim would essentially need access to financial information of Defendants

12 that it cannot be expected to possess at this stage.

13        With this collective information now at the fore for the parties' consideration moving

14 forward, the Court finds a comfortable stopping point and defers further judgment on the

15 sufficiency of these allegations given that full resolution cannot be had with the insufficient

16 relevant market definition.

17

18                          **3.      Antitrust Injury**

19        Next up are Defendants' antitrust injury challenges.  An antitrust injury consists of (1)

20 unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the

21 conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.  Somers,

22 729 F.3d at 963.  The Ninth Circuit has also imposed a fifth requirement that "the 'injured party be

23 a participant in the same market as the alleged malefactors.'"  Glen Holly Ent., Inc., 352 F.3d at

24 1008 (quoted source omitted).  "In other words, the party alleging the injury must be either a

25 consumer of the alleged violator's goods or services or a competitor of the alleged violator in the

26 restrained market."  Id. (quoted source omitted).

27        Broadly, Netafim alleges that Jain's acquisition of Irrigation Design and Agri-Valley was

28 both an illegal vertical merger and an illegal horizontal merger, each of which produced increased

1  prices and reduced quality across the micro-irrigation equipment and design services markets that

2  has caused harm to Netafim, other manufacturers, and growers.  Defendants argue that Netafim's

3  injury allegations regarding increased prices or reduced quality are insufficient.  They also contend

4  that, even if an injury has been sufficiently alleged, Netafim has failed to plausibly allege that that

5  injury was caused by their conduct.  The Court takes these arguments in reverse order.

6

7                           **a.      Causation**

8         To plead an antitrust claim, the plaintiff must "allege some credible injury caused by [the

9  defendant's] unlawful conduct."  Am. Ad Mgmt., Inc., 190 F.3d at 1056.  For their first challenge,

10  Defendants hone in on Netafim's allegation that, "[f]ollowing the announcement of the

11  acquisition, Netafim could no longer work with [Irrigation Design and Agri-Valley] and

12  terminated its relationships with them."  Compl., ¶ 31.  With this allegation, Defendants assert that

13  Netafim conceded that the cause of its purported injuries, if any, was its own voluntary decision to

14  refuse to do business with the design firms after their acquisition by Jain.

15        The Court rejects this argument, at this stage, as it relies solely on isolating a particular

16  allegation from its greater context within the complaint.  Namely, in addition to the allegation

17  above, Netafim explains that it ended the design firm relationships, in part, because Jain would

18  make the design firms favor its own products over those manufactured by competitors including

19  Netafim.  Id., ¶ 32.  Netafim supports this allegation by quoting from Jain's public announcement

20  of the acquisition as being a "[m]ajor push to deploy [Jain's] leading Agriculture Technology

21  portfolio" and means by which Jain would be able to "build direct relationships with growers"

22  through the design firms.  Id.  Netafim also supports this allegation by explaining that the design

23  firms did in fact favor Jain's products after the acquisition.  Id., ¶ 33.  As one example, Netafim

24  describes being informed by a large cantaloupe grower that Irrigation Design had "flipped" the

25  grower from Netafim to Jain.  Id.  It adds that other growers informed that Irrigation Design

26  pressured them to switch their business to Jain too.  Id.  The other reason for ending the

27  relationships, according to Netafim, was its inability to bid on projects through the design firms

28  without providing Jain with access to its competitively sensitive pricing and product information.

1   Id., ¶ 34.  In theme, Netafim alleges elsewhere in the complaint that manufacturers' close working

2   relationships with design firms includes provision of "non-public pricing and individualized

3   quotes for projects."  Id., ¶ 19.

4        When read together and in a light most favorable to Netafim, the Court does not find a fatal

5   pleading deficiency.  Although Defendants describe Netafim's additional reasoning as pretext for

6   its decision to boycott the design firms, the Court cannot draw the same conclusion without

7   betraying the legal standard for considering a Rule 12(b)(6) motion.  The same can be said for

8   Defendants' assertion that, since the acquisition, the design firms have repeatedly sought

9   Netafim's business to no avail.  Defendants' best authority for an analogous pleading failure

10  featured allegations indicating that the plaintiff had "voluntarily withdrew from competition" in

11  the relevant market by executing a contract with the defendant to sell virtually all the assets of its

12  relevant division.  Chrysler Corp. v. Fedders Corp., 643 F.2d 1229, 1235 (6th Cir. 1981).  This

13  may have constituted a failure to plead causation, but Netafim has made no comparable claim that

14  it sought to entirely remove itself from the market for micro-irrigation equipment manufacturing.

15  Finally, Defendants' citation to case law at the summary judgment stage is inapt here.  See United

16  Indus., Inc. v. Eimco Process Equip. Co., 61 F.3d 445, 448-49 (5th Cir. 1995); Argus Inc. v.

17  Eastman Kodak Co., 801 F.2d 38, 43-45 (2d Cir. 1986).  While a dispute on this issue may play

18  out differently as this litigation progresses, the allegations at hand allow for a reasonable inference

19  that Netafim's own action did not break the causal chain.

20

21                          **b.    Injury**

22        For their other argument, Defendants contend that Netafim has not pleaded a plausible

23  antitrust injury.  "A plaintiff may only pursue an antitrust action if it can show *antitrust* injury,

24  which is to say injury of the type the antitrust laws were intended to prevent and that flows from

25  that which makes defendants' acts unlawful."  Am. Ad Mgmt., Inc., 190 F.3d at 1055 (quoted

26  source and internal marks omitted); see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429

27  U.S. 477, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977) ("Every merger of two existing entities into one,

28  whether lawful or unlawful, has the potential for producing economic readjustments that adversely

1   affect some persons.  But Congress has not condemned mergers on that account; it has condemned

2   them only when they may produce anticompetitive effects.").  "It is well established that the

3   antitrust laws are only intended to preserve competition for the benefit of consumers."  Id.

4   "Consumer welfare is maximized when economic resources are allocated to their best use . . . , and

5   when consumers are assured competitive price and quality."  Rebel Oil Co., 51 F.3d at 1433.

6   Thus, "the antitrust laws are only concerned with acts that harm 'allocative efficiency *and* raise[ ]

7   the price of goods above their competitive level or diminish[ ] their quality.'"  Pool Water Prods.

8   v. Olin Corp., 258 F.3d 1024, 1034 (9th Cir. 2001) (quoting Rebel Oil Co., 51 F.3d at 1433).

9        Turning to the complaint, for both antitrust claims, Netafim alleges that "the acquisition

10   increased prices and reduced quality in the relevant markets for micro-irrigation equipment and

11   design services in Central California."  Compl., ¶¶ 84, 91.  Netafim explains that these effects are

12   the result of Defendants' merger of a large equipment manufacturer and the area's two largest

13   design firms.  Id., ¶¶ 82–83, 89–90.  Big picture, Defendants contend that Netafim's injury

14   allegations are nothing more than conclusory, boilerplate assertions.  The Court agrees with

15   Defendants.

16        While Netafim does well to sketch outlines of a horizontal merger between the design

17   firms and a vertical merger between those design firms and Jain, its allegations do not sufficiently

18   describe how those mergers translated to harm.  For one, other than the conclusory reference to

19   increased prices and reduced quality, Netafim has not offered any factual allegations suggesting

20   that consumers (i.e., growers) have actually suffered from these or any other harms as a result of

21   the mergers.  Or as Defendants correctly point out in their reply brief, "Netafim fails to allege a

22   single instance in which, as a result of the merger, a single grower was prevented from purchasing

23   a single piece of micro-irrigation equipment."  In fact, the only substantive allegation involving a

24   post-acquisition consumer describes a cantaloupe grower switching from Netafim to Jain, which if

25   anything implies enhanced consumer welfare.  Compl., ¶ 33.  Netafim's references to reduced

26   competition for the sale of micro-irrigation equipment and between design firms provide no help

27   on this front, as reduced competition only triggers antitrust liability when consumers are harmed.

28   Rebel Oil Co., 51 F.3d at 1433.  Nor is harm to consumers demonstrated by Netafim's allegation

18

1   that non-Jain manufacturers have had to invest significant resources to compete following the

2   acquisition.  Compl., ¶ 74.  Not only does this allegation contradict a theory of reduced

3   competition, it also describes an activity—jostling for market share—that is not proscribed by

4   antitrust laws.  <u>Cargill, Inc. v. Monfort of Colorado, Inc.</u>, 479 U.S. 104, 115–16 (1986); <u>see also</u>

5   <u>Pool Water Prods.</u>, 258 F.3d at 1036 ("Increased concentration may make anticompetitive activity

6   more likely, but in and of itself it does not amount to antitrust injury.").  To that end, Netafim also

7   never explains how competing manufacturers, including itself, were injured by a harm that

8   antitrust laws were intended to prevent.  <u>Reveal Chat Holdco, LLC v. Facebook, Inc.</u>, 471 F. Supp.

9   3d 981, 997–98 (N.D. Cal. 2020) (explaining that plaintiffs must sufficiently allege that they

10   themselves have suffered antitrust injuries); <u>see also</u> <u>Big Bear Lodging Ass'n v. Snow Summit,</u>

11   <u>Inc.</u>, 182 F.3d 1096, 1102 (9th Cir. 1999) (explaining that the plaintiffs stood to benefit from

12   increased prices because they competed with, rather than consumed, the defendants' products).

13        In sum, Netafim's allegations identify harms that antitrust laws are intended to prevent, but

14   do so in a manner that fails to connect these conclusory references to specific factual

15   circumstances of this case.  Thus, the Court will grant Defendants' motion to dismiss on this

16   ground as well.

17

18        **B.     False advertising claim**

19        Defendants also seek dismissal of Netafim's claim for false advertising in violation of

20   § 43(a)(1)(B) of the Lanham Act.  15 U.S.C. § 1125(a)(1)(B).   Under this statute, a plaintiff may

21   bring an action "against persons who make false and deceptive statements in a commercial

22   advertisement [or promotion] about their own or the plaintiff's product." <u>Jarrow Formulas, Inc. v.</u>

23   <u>Nutrition Now, Inc.</u>, 304 F.3d 829, 835 (9th Cir. 2002).  For claims of this kind, the plaintiff must

24   plead (and ultimately prove) six elements:  (1) the defendant made a false or misleading statement

25   either about the plaintiff's or its own product; (2) the statement was made in a commercial

26   advertisement or promotion; (3) the statement actually deceived or has the tendency to deceive a

27   substantial segment of its audience; (4) the deception is material, in that it is likely to influence the

28   purchasing decision; (5) the defendant caused its statement to enter interstate commerce; and (6)

1  the plaintiff has been or is likely to be injured as a result of the statement, either by direct

2  diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the

3  plaintiff's product.  § 1125(a)(1)(B); Jarrow Formulas, Inc., 304 F.3d at 835 n.4.

4       For its Lanham Act claim, Netafim alleges that, following the acquisition, Defendants

5  made numerous false or misleading statements about (1) the usefulness and safety of micro-

6  irrigation equipment manufactured with additives, foaming agents, or recycled materials, and (2)

7  Netafim's ability and willingness to fulfill warranty obligations.  Id., ¶¶ 95–96.  It further

8  describes the statements—which are unpacked in greater detail below—as at least misleading, if

9  not literally false, and asserts that they were made with intent to mislead potential customers as to

10  the usefulness, reliability, and safety of Netafim's products.  Id., ¶¶ 98, 100.  As to their

11  dissemination, Netafim alleges that the statements entered interstate commerce because they were

12  posted online or spread to Netafim's customers by way of Defendants' salesforces.  Id., ¶¶ 96,

13  101.  And as to their effect, Netafim alleges that Defendants' statements both tended to deceive

14  customers and actually influenced customers' purchasing decisions.  Id., ¶¶ 99–100.

15       In the same fashion as Netafim's pleading, the Court will differentiate and separately

16  consider the allegations regarding micro-irrigation equipment statements from those related to its

17  warranty obligations.

18

19                 **a.    Micro-irrigation equipment**

20       Netafim identifies three distinct ways in which Defendants made false or misleading

21  statements about micro-irrigation equipment.

22       Netafim first describes a report from an Agri-Valley salesperson that, soon after the

23  acquisition, Jain trained Irrigation Design and Agri-Valley salespeople how to pitch against

24  Netafim equipment and did so with a sales handbook that included magnified photos purporting to

25  be damaged Netafim equipment.  Compl., ¶ 40.  Netafim alleges that it heard from this salesperson

26  that Defendants "used these images to falsely represent to customers that Netafim's equipment is

27  of inferior quality because it contains recycled materials."  Id.

28       Netafim next alleges that, in June 2017, it learned from a San Joaquin Valley grower that

Defendants' salespeople told him the following false statements:  (1) "Netafim is primarily owned by venture capitalists and the investors have been concerned with their returns"; (2) "[o]ther than changing the names of some products, there have not been recent new product advancements, or improvements in efficiency made by Netafim to stay competitive"; and (3) "[a]s a result, Netafim have been utilizing foam fillers and recycled materials to manufacture its new drip tape and hose in order to reduce its resin cost and maintain margins."  Id., ¶ 41.

Finally, Netafim describes numerous false or misleading statements that appeared in two blog posts that were published in June 2017 and August 2020.  Id., ¶¶ 43–46.  As to the June 2017 post, which was published by Jain on its commercial website and then re-published by Agri-Valley on its own website, Netafim alleges that the following false assertions were made:

- "To save money some manufacturers are adding foams, fillers and other additives to resin used to make irrigation tubing."

- "Unfortunately consumers pay for these cost cutting measures without any explanation about the compromise in material."

- "Many [competing manufacturers] no longer follow engineering standards developed to help growers ensure they have reliably performing products for years to come."

- "You can see the material voids (holes), resulting in a product that weighs less, and most likely will not have the same performance, and may be more susceptible to environmental stress cracking when used in combination with other fillers or recycled materials."

- "From research, recycled plastics will not have the same performance and long-term life as virgin resin systems designed for irrigation tubing.  For further reference and study please visit this Dow webinar or read this article about down-cycling."

- "ASABE 435 Standards . . . .  Compromises such as wall thickness, recycled resins, and the addition of fillers, foams, or other additives, make tubing that cannot meet the standards for performance set out by the 435 standards."

- "There simply is not enough of a safety factor in operating pressure and long term operating and burst pressure performance as with tubing meeting the standard."

Id., ¶ 45.

In addition to the statements above, Netafim also alleges that the following false assertions were made in a video embedded in the June 2017 post:

21

1
- "100% virgin plastic, Jain tubing comes with a 10-year warranty and conforms to ASABE standards."

2

3
- "While some manufacturers add foam, fillers, and additives to reduce their material usage, Jain manufactures tubing with a thicker wall that meets 435 advanced weather-performance standards."

4  Id., ¶¶ 46–47.  Specific to these assertions, Netafim alleges that "[i]t is false that Jain's micro-

5  irrigation tubes are made of '100% virgin plastic,'" as "Jain's products include other materials,"

6  and "Jain admits as much in other postings on its own website."  Id., ¶ 50.  Netafim points to other

7  statements made in Jain's blog posts that it contends contradict the 100% virgin plastic assertion.

8  Id.

9         As to the August 2020 blog post, which Jain published on its website, Netafim alleges that

10  Jain asserted the following:

11         "One of the major differences in the tubing is the quality of resin a manufacturer uses to make the tubing and emitter line . . . .  A couple of questions to ask of your

12         local distributor selling you the cheapest tubing possible:  Were recycled resins used to make the tubing?  Were foaming agents or fillers used to make this

13         tubing?"

14  Id., ¶ 43.  This, Netafim alleges, falsely suggests that micro-irrigation tubing and emitter lines

15  made with recycled resins, foaming agents, or other additives are low quality.  Id., ¶ 44.

16         Regarding all of the above assertions, Netafim alleges that the following suggestions are

17  false:  (1) the purpose of additives is to increase profits or cut costs at the expense of quality, and

18  (2) micro-irrigation tubing that uses recycled materials or additives does not meet ASABE 435

19  standards.  Id., ¶¶ 48–49.

20         Against these allegations, Defendants raise a litany of arguments that particular statements

21  or sets of statements fail to satisfy certain elements of a Lanham Act claim.  As an initial matter,

22  the Court finds little favor in this tactic in so far as it flattens the breadth of the pleaded claim by

23  isolating individual statements.  For instance, the Court agrees with Defendants' assertion that

24  Netafim's allegations regarding the San Joaquin Valley grower conversation describe only

25  statements made by a single salesperson to a single grower during a single sales conversation.

26  And the Court agrees that, taken alone, these allegations do not sufficiently allege a Lanham Act

27  claim.  That is, in isolation, these allegations identify false or misleading statements, but not ones

28  that were made in a commercial advertisement or promotion, entered interstate commerce, and

1    deceived or influenced the broader purchasing public.  But the Court also recognizes that Netafim

2    has not pleaded these allegations for purposes of setting forth a distinct Lanham Act claim.

3    Rather, it has done so to support its overarching claim that Defendants engaged in a

4    "misinformation campaign" regarding Netafim's products and the usefulness and safety of micro-

5    irrigation equipment manufactured with additives, foaming agents, or recycled materials.  Compl.,

6    ¶¶ 2, 39.  This in turn requires the Court to read Netafim's allegations supporting that overarching

7    claim in their entirety to determine if a sufficient claim has been pleaded.  L.A. Taxi Coop., Inc. v.

8    Uber Techs., Inc., 114 F. Supp. 3d 852, 862 & n.2 (N.D. Cal. 2015).  And reading the allegations

9    in that fashion, and in the light most favorable to Netafim, the Court finds the pleading to be

10   sufficient.

11          As catalogued above, Netafim has identified specific false or misleading statements that

12   Defendants made regarding their own micro-irrigation equipment and that of competing

13   manufacturers.  Although some of these statements did not refer directly to Netafim or include a

14   side-by-side comparison between Defendants and their competitors, some direct comparisons were

15   made and the collection as a whole reasonably indicates that such associations were implied when

16   not expressed.  See Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139, 1145 (9th Cir.

17   1997) (explaining that a statement may be actionable under the Lanham Act even without a direct

18   comparison to a competitor, and that falsity may be shown through necessary implication).  With

19   its description of the alleged statements, Netafim also depicts statements made in the context of

20   commercial advertising or promotions, given their dissemination to the relevant purchasing public

21   through direct interactions or targeted blog posts.  Newcal Indus., Inc., 513 F.3d at 1054.

22   Likewise, Netafim connects those statements to customer deception by asserting that Defendants

23   trained sales personnel to pitch against its equipment by making false representations as to its

24   quality.  While generic, this point is adequately bolstered by Netafim's description of the

25   conversation with the San Joaquin Valley grower that involved the same kind of statements, as

26   well as its allegation that growers informed of being pressured with similar sales pitches after the

27   acquisition.  See Lona's Lil Eats, LLC v. DoorDash, Inc., No. 20-CV-06703-TSH, 2021 WL

28   151978, at *8 (N.D. Cal. Jan. 18, 2021).  This combination of allegations also provides substance

for Netafim's otherwise-bald claim that it heard from customers that Defendants' statements tended to deceive and influence purchasing decisions.  In a similar fashion, Netafim's conclusory interstate commerce allegation suffices when combined with its allegations describing blog posts.  TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 829 n.3 (9th Cir. 2011).  Moreover, Netafim generally alleges that the industry for micro-irrigation products involves interstate shipments (Compl., ¶ 12), and its other allegations regarding the size and scope of that industry enable the Court to infer that the statements at least substantially affected interstate commerce.  Thompson Tank & Mfg. Co. v. Thompson, 693 F.2d 991, 993 (9th Cir. 1982).  Finally, even though Netafim's injury allegation is conclusory (Compl., ¶ 102), commercial injury is generally presumed when the plaintiff competes directly with the defendant and the defendant's statement has a tendency to mislead consumers.  ThermoLife Int'l, LLC v. Gaspari Nutrition Inc., 648 F. App'x 609, 615–16 (9th Cir. 2016); TrafficSchool.com, Inc., 653 F.3d at 826–27, 829.  The misleading factor is discussed above, and Netafim alleges throughout the complaint that it directly competes with Defendants to sell micro-irrigation equipment to growers.  Compl., ¶¶ 1, 21.

In sum, the Court finds these allegations, when read in their entirety, present a sufficient claim.  Although Defendants' motion promotes additional inquiry as to whether particular, isolated statements satisfy the elements of a Lanham Act claim, the Court declines to wade further into these disputes at this stage.  For one, some turn on fact-intensive questions that are inapt for full resolution here.  And, as explained above, Netafim's individual allegations can be actionable in support of a broader claim, even if they are not themselves actionable on their own.  While Netafim's reliance on nonactionable statements may hamper its ability to survive future challenges in this case, resolution at those stages is distinct from the Court's task at hand.

### b.      Warranty obligations

Netafim's allegations regarding Defendants' false statement about its warranty obligations are briefer than its allegations regarding the micro-irrigation equipment statements.  Namely, Netafim highlights another statement in the June 2017 blog post that, Netafim alleges, was made in reference to a then-pending change in its ownership and aimed at its ability and willingness to

fulfill warranty obligations to clients.  Compl., ¶¶ 51–52.  According to the complaint, the statement in question reads as follows:  "I would recommend asking, who is warrantying the product?  Will this company be in its current form and have the ability and willingness to honor the warranty or will you be dealing with a new owner in a business that has significantly changed."  Id., ¶ 52.  Netafim alleges that this statement "falsely insinuated Netafim would not honor its warranties" when in fact "Netafim's ability and willingness to honor its product warranties was not then and is not now dependent on its ownership."  Id., ¶¶ 52–53.

Defendants challenge these allegations on grounds that the statement constitutes puffery (as opposed to actionable false statements) and does not involve a direct comparison to Netafim.  Defendants also point out that Netafim has not alleged that this particular statement deceived customers or harmed Netafim in any way.  In opposition, Netafim does not particularize its defense of this statement, and instead seems to lump its defense of these allegations with all of those discussed above regarding micro-irrigation equipment.

The Court declines to dismiss Netafim's claim on account of the lack of a direct comparison in this statement.  Southland Sod Farms, 108 F.3d at 1145.  Likewise, at this stage, the Court declines to conclusively determine that this statement is "extremely unlikely to induce consumer reliance," and thus nonactionable puffery.  Newcal Indus., Inc., 513 F.3d at 1053.  Otherwise, however, the Court finds Netafim's opposition to be unpersuasive.  While Netafim provides factual allegations that illustrate how Defendants' false statements regarding micro-irrigation equipment tended to deceive customers as to that equipment, it has not included similar details regarding the warranty statement.  Instead, for purposes of this statement, Netafim must rely solely on its boilerplate allegation that all of statements set forth in the complaint tended to deceive customers.  Compl., ¶ 99.  The Court cannot infer from this allegation alone that Defendants' allegedly false statement—which, at most, impliedly references Netafim's ability and willingness to fulfill warranty obligations—actually deceived or tended to deceive a substantial segment of the relevant purchasing public.  The Court also finds the same defect with Netafim's pleading of the materiality or influence of any deception, as Netafim's allegations on that element make no mention of the Netafim's warranty obligations.  Id., ¶ 100.  And that lack of sufficiently

alleged deception leaves Netafim unable to avail itself of a presumption of injury here. Without this, Netafim's generic allegation that all of Defendants' statements caused Netafim to be injured is not enough. Id., ¶ 102. For all of these insufficiencies, the Court will dismiss this portion of Netafim's Lanham Act claim and grant Netafim leave to amend.

### **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.    Defendants' motion to dismiss (Doc. No. 15) is GRANTED in part and DENIED in part;

    a.    The first cause of action for violation of the Sherman Act is DISMISSED without prejudice;

    b.    The second cause of action for violation of the Clayton Act is DISMISSED with prejudice to the extent it seeks damages against Defendants Irrigation Design and Agri-Valley;

    c.    The second cause of action for violation of the Clayton Act is otherwise DISMISSED without prejudice;

    d.    The third cause of action for violation of the Lanham Act is DISMISSED, without prejudice, to the extent the claim is based on the warranty statement; and

2.    Netafim is GRANTED leave to file an amended complaint. If Netafim elects to file a first-amended complaint, it must do so within thirty days of service of this order.

IT IS SO ORDERED.

Dated:   December 14, 2021          _____

                              SENIOR  DISTRICT  JUDGE