1

2          **UNITED STATES DISTRICT COURT**

3          **EASTERN DISTRICT OF CALIFORNIA**

4

5  **NETAFIM IRRIGATION, INC.,**              **CASE NO. 1:21-cv-00540-AWI-EPG**

6              **Plaintiff,**

7          **v.**                             **ORDER ON DEFENDANTS' MOTION
                                               TO DISMISS PLAINTIFF'S FIRST**
8  **JAIN IRRIGATION, INC., JAIN**            **AMENDED COMPLAINT**
   **DISTRIBUTION HOLDINGS, INC.,**
9  **IRRIGATION DESIGN &**
   **CONSTRUCTION, LLC, and AGRI-**           (Doc. No. 34)
10 **VALLEY IRRIGATION, LLC,**

11             **Defendants**

12

13

14         This case involves an alleged anticompetitive acquisition involving competitors in the

15 micro-irrigation industry.  Presently before the Court is Defendants Jain Irrigation, Inc., Jain

16 Distribution Holdings, Inc., Irrigation Design & Construction, LLC, and Agri-Valley Irrigation,

17 LLC's Motion to Dismiss Plaintiff Netafim Irrigation, Inc.'s First Amended Complaint.  Doc. No.

18 34.  The First Amended Complaint ("FAC") asserts causes of action under Section 1 of the

19 Sherman Act, Section 7 of the Clayton Act, and the Lanham Act.  Doc. No. 25.  Having

20 considered the parties' submissions, the Court will grant in part and deny in part Defendants'

21 Motion.

22                        **BACKGROUND[1]**

23         Plaintiff and Defendants are involved in the micro-irrigation industry in Central California.

24 Doc. No. 25, ¶ 2.  Micro-irrigation is a comparatively cost-effective and sustainable form of

25 irrigation that delivers water and nutrients directly to the root systems of crops.  Id., ¶ 17.  The

26

27 ─────────────
   [1] This section summarizes allegations set forth in the FAC.  See Doc. No. 25.  Additionally, the Court takes judicial
   notice of the exhibit (Doc. No. 36-2) submitted with Defendants' motion to dismiss.  See BMA LLC v. HDR Global
28 Trading Ltd., 2021 U.S. Dist. LEXIS 169327, *8 n.4 (N.D. Cal. Sep. 7, 2021); Kim v. Shellpoint Partners, LLC, 2016
   U.S. Dist. LEXIS 44144, *10 (S.D. Cal. Mar. 30, 2016).

1   micro-irrigation industry has three levels: (1) manufacturers that produce equipment for micro-

2   irrigation systems; (2) local design firms that customize, install, and maintain micro-irrigation

3   systems for growers; and (3) growers that purchase and use micro-irrigation systems on their

4   farms.  Id., ¶ 18.  Growers do not purchase micro-irrigation equipment directly from

5   manufacturers, but instead purchase it through local design firms.  Id., ¶ 20.  The services and

6   expertise of local design firms are crucial to growers because improper irrigation risks harm to a

7   grower's crop and livelihood and because micro-irrigation systems require substantial investments

8   in equipment of as much as $1,000-$3,000 per acre.  Id.

9        Manufacturers compete to supply micro-irrigation equipment through local design firms.

10  Id., ¶ 19.  To ensure that design firms are knowledgeable about the manufacturers' product lines

11  and prices, manufacturers invest time and money in their relationships with the design firms.  Id.,

12  ¶ 21.  Manufacturers also often provide design firms with non-public pricing and individualized

13  bids on large projects.  Id.  Notwithstanding these relationships, design firms have historically

14  worked with multiple manufacturers to offer growers a wide selection of micro-irrigation

15  equipment so that growers have a choice between competitive products and can select between

16  them based on price and quality.  Id., ¶ 22.  This approach fosters competition between

17  manufacturers to offer lower prices and higher quality so that design firms would carry their

18  products and recommend them to growers.  Id.

19       Plaintiff and the Jain entities are the two largest manufacturers in Central California.  Id., ¶

20  19.  Other competing manufacturers include Rivulis, Eurodrip, Toro, Irritec, and Rain Bird.  Id.  In

21  2016, Plaintiff had approximately $65 million in sales in Central California.  Id.  Jain, on the other

22  hand, had approximately $25 million in Central Valley sales in 2016.  Id.  Rivulis and Eurodrip,

23  who was later acquired by Rivulis in 2017, had combined sales of approximately $20 million in

24  Central California in 2016.  Id.  Toro, Irritec, and Rain Bird each had Central California sales in

25  2016 of approximately $15 million, $6 million, and $5 million, respectively.  Id.

26       On May 16, 2017, Defendant Jain Distribution Holdings, Inc.—a sister company of

27  Defendant Jain Irrigation, Inc.—acquired an 80% interest in Defendant Irrigation Design &

28  Construction, LLC ("IDC") and an 80% interest in Defendant Agri-Valley Irrigation, LLC

("AVI").[2]  Id.  Before these acquisitions, IDC and AVI were the largest local design firms in a

number of markets in Central California.  Id., ¶¶ 23, 24.  IDC had stores farther north in Central

California, such as in Dixon and Stockton, while AVI had stores farther south, such as in Fresno,

Visalia, and Bakersfield.  Id., ¶ 38.  They had overlapping stores in the central part of the valley,

such as in Dos Palos-Firebaugh.  Id.  Based on Plaintiff's experiences in and understanding of the

micro-irrigation industry in Central California, IDC and AVI had the following estimated

combined market shares in 2016 in the following geographic markets:

- Dos Palos-Firebaugh:[3] Approximately 60-65%

- Patterson-Newman:[4] Approximately 45%

- Stockton:[5] Approximately 50%

Id., ¶ 25.

Pre-acquisition, IDC and AVI carried and sold equipment from many manufacturers,

including those of Plaintiff, Jain, Rivulis, Eurodrip, Toro, Irritec, and Rain Bird.  Id., ¶¶ 26, 27.  In

2016, IDC was Plaintiff's largest dealer in Central California, selling over $7.2 million of

Plaintiff's products.  Id., ¶ 29.  AVI was also a large Netafim dealer, selling over $1.4 million in

Plaintiff's products.  Id.  Netafim made substantial sales through IDC and AVI in previous years,

and had invested in expanding its relationship with IDC and AVI.  Id.  IDC and AVI were also

---

[2] While the FAC explains that Jain Distribution is the holding company for IDC and AVI— and that both Jain Distribution and Jain Irrigation are wholly owned subsidiaries of Jain Irrigation Systems Limited, "an Indian multi-national conglomerate" that has not itself been sued in this action—the FAC refers to Jain Irrigation and Jain Distribution collectively as "Jain."  See Doc. No. 25, ¶ 7.  Defendants do not dispute this naming convention in their briefing.  Thus, for purposes of this order, the Court will adopt that practice as well.

[3] The FAC describes the Dos Palos-Firebaugh market as "no broader than the region bounded by Interstate 5 on the west, up to the Los Banos Waterfowl Management Area, San Luis National Wildlife Refuge, and Merced National Wildlife Refuge on the northwest, over to Chowchilla on the northeast, and down to Mendota on the south."  See Doc. No. 25, ¶ 67.  Netafim had sales of about $3.1 million through IDC and AVI in 2016 and made about 50% of its sales through them in this market.  Id., ¶ 68.

[4] The FAC describes the Patterson-Newman market as "no broader than the region bounded by Interstate 5 on the west, up to Tracy on the northwest, to Waterford on the northeast, to Livingston on the east, and down toward Los Banos on the south."  See Doc. No. 25, ¶ 69.  Netafim had total sales of about $2 million through IDC in 2016 and made about 99% of its sales in this market through IDC.  Id., ¶ 70.

[5] The FAC describes the Stockton market as "no broader than the area extending to Collierville in the north, the Sierra Nevada foothills and Escalon-Bellota Road on the east, the Stanislaus River on the southeast, and the California Delta on the west."  See Doc. No. 25, ¶ 71.  Netafim had total sales of about $2.8 million through IDC in 2016 and made about 40% of its sales in this market through IDC.  Id., ¶ 72.

1   large dealers in 2016 for other manufacturers including Rivulis, Eurodrip, Toro, Irritec, and Rain

2   Bird.  Id., ¶ 30.

3        Post-acquisition, Plaintiff terminated its relationships with IDC and AVI because its

4   products would allegedly be disfavored to Jain's products and because Plaintiff wished to avoid

5   providing Jain with access to its competitively sensitive pricing and product information.  Id., ¶

6   33.  Additionally, after the acquisition, IDC and AVI allegedly stopped offering the products of

7   Rivulis, Eurodrip, Toro, Irritec, and Rain Bird to growers.  Id., ¶ 34.  Plaintiff attempted to make

8   up for its loss of sales but was unable to replace IDC and AVI by selling more of its products

9   through other design firms.  Id., ¶ 42.

10       On March 29, 2021, Plaintiff filed the original Complaint in this Court seeking damages

11   and equitable relief.  Doc. No. 1.  The Court later dismissed the Complaint's antitrust claims

12   against Jain with leave to amend on the grounds that they failed to sufficiently plead a relevant

13   geographic market and antitrust injuries.  Doc. No. 20.  On January 13, 2022, Plaintiff filed its

14   FAC, alleging that it suffered millions of dollars in harm in three geographic markets: (1) Dos

15   Palos-Firebaugh, (2) Patterson-Newman, and (3) Stockton.  Doc. No. 25, ¶¶ 42, 65.  Defendants

16   thereafter filed their Motion to Dismiss the Antitrust Claims in the FAC on February 10, 2022.

17   Doc. No. 34.

18                            **LEGAL STANDARD**

19       Under Federal Rule of Civil Procedure 12(b)(6), a cause of action may be dismissed where

20   a plaintiff fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

21   Dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the

22   absence of sufficient facts alleged under a cognizable legal theory.  Godecke ex rel. United States

23   v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019) (citing Balistreri v. Pacifica Police

24   Dep't, 901 F.2d 696, 699 (9th Cir. 1990)).  To survive a Rule 12(b)(6) motion for failure to allege

25   sufficient facts, a complaint must include a "short and plain statement of the claim showing that

26   the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Compliance with this rule ensures that

27   the defendant has "fair notice" of the claims against it.  Williams v. Yamaha Motor Co., 851 F.3d

28   1015, 1025 (9th Cir. 2017) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Under

this standard, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."  Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc., 998 F.3d 397, 403 (9th Cir. 2021) (quoting Twombly, 550 U.S. at 570).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct.  Id. (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  Benavidez v. Cty. of San Diego, 993 F.3d 1134, 1144 (9th Cir. 2021).  But the Court is "not 'required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.'"  Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013) (quoted source omitted).  Complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Benavidez, 993 F.3d at 1145 (citing Iqbal, 556 U.S. at 678).  Rather, "[f]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."  Hernandez v. City of San Jose, 897 F.3d 1125, 1132 (9th Cir. 2018) (citing Iqbal, 556 U.S. at 678).

If a motion to dismiss is granted, a "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  Perez v. Mortg. Elec. Registration Sys., 959 F.3d 334, 340 (9th Cir. 2020) (citing Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000)).

## DISCUSSION

### I.   Defendants' Motion to Dismiss

Defendants move to dismiss the FAC's first cause of action (Sherman Act, Section 1) and second cause of action (Clayton Act, Section 7) on the grounds that they fail to sufficiently allege

1  a relevant market, market power, and antitrust injury.[6]  The Court will address each alleged ground

2  for dismissal below in turn.

3      **A.  Relevant Market**

4      *Defendants' Arguments*

5          Defendants argue that the alleged geographic markets (Dos Palos-Firebaugh, Patterson-

6  Newman, and Stockton) are deficient because their boundaries were delineated not according to

7  any alleged limiting principle, but rather to suit Plaintiff's litigation needs.  Specifically,

8  Defendants assert that the markets were gerrymandered to include certain areas and exclude others

9  so that the resulting areas are ones in which AVI and IDC have high market shares.  According to

10  Defendants, these boundaries defy reality because they focus only on a subset of AVI and IDC's

11  storefront locations and they fail to explain why some growers within the boundaries could not

12  more conveniently purchase relevant products and services at locations outside the boundaries.

13      *Plaintiff's Arguments*

14          Plaintiff argues that the alleged markets are proper because their boundaries are based not

15  on where Defendants are located but on where growers are located and where they can turn for the

16  relevant products and services.  According to Plaintiff, the FAC describes the population centers,

17  illustrates the geographic features separating one market from another, and explains why growers

18

19  [6] Defendants argue, without opposition by Plaintiff, that Plaintiff's antitrust claims under Section 1 of the Sherman Act and Section 7 of the Clayton Act are subject to the same antitrust injury, relevant market, and market power

20  pleading requirements.  Doc. No. 34-1 at 9-10.  Ninth Circuit case law indicates that the standard for analyzing "relevant market" under Sections 1 and 2 of the Sherman Act are generally the same as under Section 7 of the Clayton Act.  See Newcal Indus. v. Ikon Office Sol., 513 F.3d 1038, 1044 n.3 (9th Cir. 2008) ("The 'relevant market' and

21  'market power' requirements apply identically under the two different sections of the [Sherman] Act, meaning that the requirements apply identically to [§ 1 and § 2 claims].");  Kaplan v. Burroughs Corp., 611 F.2d 286, 292 n.2 (9th Cir.

22  1979) ("Generally, principles of market definition applicable to cases arising under Sherman Two are also applicable to Sherman One actions, and to merger cases arising under § 7 of the Clayton Act.");  Greyhound Comput. Corp. v.

23  Int'l Bus. Machs. Corp., 559 F.2d 488, 494 n.7 (9th Cir. 1977) (stating that a claim under § 7 of the Clayton Act "is equally applicable" to cases arising under § 2 of the Sherman Act).  Additionally, courts in the Ninth Circuit have

24  used the same standard to analyze "market power" for both Sherman Act Section 1 and Clayton Act Section 7 claims.  See Intel Corp. v. Fortress Inv. Grp. LLC, 511 F. Supp. 3d 1006, 1025 (N.D. Cal. 2021) (stating that "Plaintiffs' § 7

25  claims are subject to the same [market power] evidence analysis that applies in § 1 claims");  Med Vets, Inc. v. Vip Petcare Holdings, Inc., 2019 U.S. Dist. LEXIS 68099, *8 (N.D. Cal. Apr. 22, 2019) ("Where, as here, plaintiffs bring

26  claims under Section 7 of the Clayton Act and Section 2 of the Sherman Act, they must allege a relevant market in which defendants have market power.").  Furthermore, "antitrust injury" is a necessary predicate for possessing the

27  unique antitrust standing required for claims under the Sherman and Clayton Acts.  Somers v. Apple, Inc., 729 F.3d 953, 963 (9th Cir. 2013);  Glen Holly Ent., Inc. v. Tektronix Inc., 352 F.3d 367, 371 (9th Cir. 2003).  Therefore, for

28  purposes of this Order, the Court will use the same standards to analyze antitrust injury, relevant market, and market power for Plaintiff's Sherman Act Section 1 and Clayton Act Section 7 claims.

1    located in these areas would not travel elsewhere for their purchases.  Furthermore, Plaintiff

2    argues that the details of any cross-border purchases and the contours of the geographic markets

3    are factual inquiries that should be resolved on the merits rather than during the pleading stage.

4        *Legal Standard*

5        "A threshold step in any antitrust case is to accurately define the relevant market, which

6    refers to 'the area of effective competition.'"  FTC v. Qualcomm Inc., 969 F.3d 974, 992 (9th Cir.

7    2020) (citing Ohio v. American Express Co., 138 S. Ct. 2274, 2285 (2018)).  Setting the relevant

8    market boundaries is a critical first step as it enables the court to assess issues regarding market

9    share, the defendant's ability to lessen or destroy competition, and the alleged antitrust injury.  Id.

10        To define a relevant market, the plaintiff must identify a geographic market.  Hicks v.

11   PGA Tour, Inc., 897 F.3d 1109, 1120 (9th Cir. 2018).  The relevant geographic market is the "area

12   of effective competition" where buyers can turn for alternate sources of supply if a seller

13   attempted to exercise market power by increasing price or decreasing quality.  Saint Alphonsus

14   Med. Ctr. - Nampa, Inc. v. Saint Luke's Health Sys., 778 F.3d 775, 784 (9th Cir. 2015).  A

15   common method to determine the relevant geographic market is to find whether a hypothetical

16   monopolist could impose a "small but significant nontransitory increase in price" ("SSNIP") in the

17   proposed market.  Id.  If enough consumers would respond to a SSNIP by purchasing the product

18   from outside the proposed geographic market, making the SSNIP unprofitable, the proposed

19   market definition is too narrow.  Id.

20        A geographic market need not be alleged or proved with "scientific precision," nor must it

21   be defined "by metes and bounds as a surveyor would lay off a plot of ground."  United States v.

22   Conn. Nat'l Bank, 418 U.S. 656, 669 (1974); United States v. Pabst Brewing Co., 384 U.S. 546,

23   549 (1966); see also FTC v. Lab. Corp. of Am., 2011 U.S. Dist. LEXIS 20354, *49 (C.D. Cal.

24   Feb. 22, 2011).  Rather, the complaint need only include sufficient information to present a

25   relevant geographic market that is facially sustainable.  Newcal Indus., Inc. v. Ikon Office Sol.,

26   513 F.3d 1038, 1045 (9th Cir. 2008).  Relevant market determinations are typically fact-intensive,

27   with actual "inquiry into the 'commercial realities' faced by consumers."  High Tech. Careers v.

28   San Jose Mercury News, 996 F.2d 987, 990 (9th Cir. 1993) (quoted source omitted).  This often

1  enables market-defining allegations to survive scrutiny under Rule 12(b)(6).  Newcal Indus., 513

2  F.3d at 1045.

3  *Discussion*

4  The original Complaint defined the relevant geographic markets as the "local geographic

5  markets where growers demand design services and where design firms provide design services."

6  Doc. No. 1, ¶ 61.  The Court rejected this definition because the phrase "local geographic

7  markets" was amorphous and lacked limiting principles that would provide enough notice for the

8  parties to be able to proceed with the case.  The Court also rejected the definition to the extent it

9  delineated the relevant geographic markets based on certain counties and zip codes.  To cure these

10  deficiencies, the FAC focuses on three geographic markets with delineated boundaries: (1) the Dos

11  Palos-Firebaugh market, (2) the Patterson-Newman market, and (3) the Stockton market.  Doc.

12  No. 25, ¶ 65.

13  Upon review, the Court finds that compared to the original Complaint, the FAC defines the

14  relevant geographic markets with considerably more concrete geographic terms which are not

15  inherently implausible on their face.  While the FAC lists all the localities where IDC and AVI

16  had storefronts in Central California, it focuses on the three aforementioned markets in which IDC

17  and AVI, for purposes of this lawsuit, had significant market shares and were relied on by

18  Plaintiff.  The FAC excluded some territories from these markets because they are comprised of

19  uncultivated land, wildlife refuges, state parks, and mountain ranges.  Additionally, the FAC relied

20  in part on population areas designated by the U.S. Census to distinguish and demarcate these three

21  markets.  Although the Court has questions about the FAC's three-part division of the Central

22  California region, the markets' "viability raises fact-intensive questions that cannot be resolved at

23  this stage."  Pacific Steel Grp. v. Commer. Metals Co., 2022 U.S. Dist. LEXIS 75797, *28 (N.D.

24  Cal. Apr. 26, 2022) (finding that alleged geographic market was not implausible on its face despite

25  "the Court ha[ving] questions about this unusually narrow geographic market"); cf. Newcal Indus.,

26  513 F.3d at 1045.

27  Defendants' main point of contention is that these three markets are not the "area of

28  effective competition" because some growers within these markets could more easily turn for

1   alternate sources of supply outside their respective markets.  For example, Defendants point out

2   that a grower in Los Banos, California (i.e., the Dos Palos-Firebaugh market) could simply

3   purchase design services from competing design firms located in Newman, California (i.e., the

4   Patterson-Newman market).  Doc. No. 34-1 at 18.  While Defendants' examples may be true to a

5   certain extent, they are not dispositive.  The geographic market inquiry used in the Ninth Circuit

6   does not focus on whether *all* customers within the alleged area purchase solely from sellers

7   within that area.  Rather, the inquiry is whether "*enough* consumers would respond to a SSNIP by

8   purchasing the product from outside the proposed geographic market."  Saint Alphonsus Med.,

9   778 F.3d at 784 (emphasis added).  Whether Defendants' hypotheticals are true and pervasive

10  enough to defeat Plaintiff's geographic market allegations is a factual question not suited for

11  resolution at the pleading stage.  See High Tech. Careers, 996 F.2d at 990; Newcal Indus., 513

12  F.3d at 1045.  At this stage of the litigation, the FAC alleges sufficient information to present a

13  relevant geographic market that is facially sustainable.  Newcal Indus., 513 F.3d at 1045.

14          **B.  Market Power**

15          *Defendants' Arguments*

16          Defendants assert that the FAC fails to sufficiently allege market power to proceed with its

17  antitrust claims.  According to Defendants, the FAC does not provide any explicit examples of

18  Defendants manipulating market-wide supply and pricing with their output.  Additionally,

19  Defendants argue that the allegation that AVI and IDC possess dominant market shares is deficient

20  because it misconstrues their actual market shares and ignores Defendant Jain's market shares.

21  Furthermore, Defendants contend that there are no "high barriers" that prevent potential

22  competitors from entering the relevant markets.  According to Defendants, the barriers to entry

23  alleged in the FAC are simply costs that any competitor would incur when entering the relevant

24  markets.

25          *Plaintiff's Arguments*

26          Plaintiff argues that the FAC sufficiently alleges Defendants' market power in that

27  Defendants directly reduced choices for growers, excluded competitors, increased prices, lowered

28  quality, and reduced output.  Additionally, Plaintiff asserts that Defendant's "dominant market

1  shares" have been sufficiently alleged and calculated based on its experiences in and

2  understanding of the relevant markets and the relative size and importance of IDC and AVI

3  therein.  Furthermore, Plaintiff opines that the FAC sufficiently alleges market-entry barriers—i.e.,

4  that growers primarily rely on design firms they have used before, that growers are reluctant to

5  switch to new design firms, and that design firms seeking to enter the relevant markets must invest

6  in facilities and personnel, and develop relationships with, and expertise in the requirements of,

7  local growers.  According to Plaintiff, all the above direct and circumstantial evidence is sufficient

8  to survive Defendants' motion to dismiss.

9       *Legal Standard*

10      Market power is the ability of a seller "to raise price and restrict output."  Eastman Kodak

11  Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 464 (1992); Rebel Oil Co. v. Atl. Richfield Co., 51

12  F.3d 1421, 1434 (9th Cir. 1995).  Market power can be proved through direct or circumstantial

13  evidence.  Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., 20 F.4th 466, 484 (9th Cir. 2021).

14  Direct evidence consists of proof of an injury to competition that a competitor with market power

15  could inflict, such as evidence showing restricted output and supracompetitive prices, i.e., prices

16  above competitive levels.  Rebel Oil, 51 F.3d at 1434.  Circumstantial evidence, the more common

17  type of proof, pertains to the structure of the market.  Lucas Auto. Eng'g, Inc. v.

18  Bridgestone/Firestone, Inc., 140 F.3d 1228, 1237 (9th Cir. 1998).  To demonstrate market power

19  circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns

20  a dominant share of that market, and (3) show that there are significant barriers to entry and that

21  existing competitors lack the capacity to increase their output in the short run.  Optronic Techs.,

22  Inc., 20 F.4th at 484.  Entry barriers include "additional long-run costs that were not incurred by

23  incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry

24  while permitting incumbent firms to earn monopoly returns."  Rebel Oil, 51 F.3d at 1439 (citing

25  L.A. Land Co. v. Brunswick Corp., 6 F.3d 1422, 1427-28 (9th Cir. 1993)).  The main sources of

26  entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource;

27  (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing

28  higher capital costs on new entrants; and, in some situations, (5) economies of scale.  Id.  Similar

1  to the relevant market definition, ascertaining market power is fact-intensive and case-specific;

2  thus, market power allegations often survive scrutiny under Rule 12(b)(6).  Eastman Kodak Co.,

3  504 U.S. at 466–67; Newcal Indus., 513 F.3d at 1052.  However, the allegations of market power

4  must be sufficiently detailed "to raise a right to relief above the speculative level."  Rick-Mik

5  Enters., Inc. v. Equilon Enters. LLC, 532 F.3d 963, 973 (9th Cir. 2008) (quoting Twombly, 550

6  U.S. at 555).

7          *Discussion*

8          Along with a relevant market definition, Plaintiff was required to plead that Defendants

9  have power within that market.  The FAC does not satisfy this requirement with either direct or

10 circumstantial evidence.

11         1.  Direct Evidence

12         With respect to direct evidence of market power, the Court previously noted that the

13 original Complaint "[did] not directly allege that the acquisition choked output," that "supra-

14 competitive prices [were] not identified," and that the complaint stated "in conclusory fashion"

15 that the acquisition led to increased prices for micro-irrigation equipment and design services.

16 Doc. No. 20 at 13-14.  To address these concerns, the FAC alleges that Defendants denied growers

17 that rely on AVI and IDC access to competitive products from Netafim and other manufacturers,

18 such as Rivulis, Eurodrip, Toro, Irritec, and Rain Bird.  Doc. No. 25, ¶¶ 33-35, 74.  This resulted

19 in: (1) "growers purchasing Jain products that were higher priced or lower quality than those they

20 otherwise would have purchased," and (2) "a market-wide increase in prices and decrease in

21 quality" in those "markets where IDC and AVI had market power."  Id., ¶ 74.  Furthermore, the

22 FAC alleges that the market-wide output of micro-irrigation equipment in the relevant markets

23 decreased as a result of Netafim and other micro-irrigation equipment suppliers being unable to

24 sell through IDC and AVI.  Id.

25         The Court finds that the FAC does not provide sufficient direct evidence of market power.

26 Although the FAC alleges that Defendants' increased prices and reduced quality impacted

27 "growers that relied on IDC and AVI for design services," it does not allege any non-conclusory

28 facts about growers' ability to find a better deal at other existing design firms, or about the prices

11

1   and quality offered by other design firms, including those with whom Plaintiff had business

2   relationships.  See Dominick v. Collectors Universe, 2012 U.S. Dist. LEXIS 141950, *19 (C.D.

3   Cal. Oct. 1, 2012) (finding no direct evidence of market power in part because the complaint made

4   no comparison between the "higher prices" consumers were forced to pay with plaintiff and the

5   prices offered by plaintiff's competitors).  And despite the Court's earlier warning that "supra-

6   competitive prices" were "not identified" in the original Complaint, Doc. No. 20 at 14, Plaintiff

7   again does not identify supracompetitive prices in the FAC.  See id. at *18-*19 (ruling that an

8   allegation of "'artificially high' prices cannot be equated to supracompetitive prices unless a

9   plaintiff provides evidence to the contrary," such as evidence that competitors are unable to charge

10  similarly high prices); see also Sidibe v. Health, 4 F. Supp. 3d 1160, 1180 (N.D. Cal. 2013)

11  (dismissing complaint because "Plaintiffs' conclusory allegations [that defendant forced

12  consumers to pay more] do not establish direct evidence of market power").  For example, while

13  the FAC states that growers generally spend as much as "$1,000-$3,000 per acre" on micro-

14  irrigation equipment, Doc. No. 25, ¶ 20, the FAC does not allege a higher dollar amount charged

15  by Defendants per acre for post-acquisition Jain products.  In fact, the FAC does not state the price

16  of any single piece of micro-irrigation equipment or service at all.

17          The FAC's allegations of restricted output are also unavailing, and this deficiency alone

18  may preclude a finding of direct evidence of market power.  Forsyth v. Humana, Inc., 114 F.3d

19  1467, 1476 (9th Cir. 1997) (holding that with "no accompanying showing of restricted output,"

20  plaintiff's allegation that defendant charged higher prices than competitors "failed to present direct

21  evidence of market power"), overruled on other grounds by Lacey v. Maricopa County, 693 F.3d

22  896 (9th Cir. 2012); Safeway Inc. v. Abbott Labs., 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011)

23  ("[S]upracompetitive pricing, on its own, is not direct evidence of monopoly power.").  The FAC

24  alleges that sales of non-Jain products through IDC and AVI decreased after the acquisition in

25  2017, resulting in "market-wide reduction in output of micro-irrigation equipment."  Doc. No. 25,

26  ¶ 74.  However, the FAC also alleges that Defendants engaged in a "major push" to sell Jain's

27  products, implying that the decreased output of non-Jain products at IDC and AVI was

28  accompanied by corresponding increased output of Jain products.  The FAC also states that

1    Plaintiff's "sales in Central California overall were increasing from 2016 to 2018," suggesting that

2    Plaintiff's overall output actually increased during and after the acquisition.  Doc. No. 25, ¶ 42.

3    While Plaintiff's overall sales might have been greater but for the acquisition, the FAC does not

4    sufficiently address how Plaintiff's overall sales increased in the region amid Defendants' alleged

5    restriction of market-wide output.  Cf. Humana Inc. v. Mallinckrodt Ard LLC, 2020 U.S. Dist.

6    LEXIS 101378, *18-*19 (C.D. Cal. Mar. 9, 2020) (finding no direct evidence of market-wide

7    restricted output at pleading stage because the record contained evidence that output of the product

8    actually increased following the defendant's challenged conduct).  Based on the FAC, it is unclear

9    whether despite the parties' increased sales, the net market-wide output of micro-irrigation

10   equipment declined as a result of Defendants' conduct.  As written, the FAC does not sufficiently

11   allege that Defendants restricted the market-wide output of micro-irrigation equipment.[7]  Forsyth,

12   114 F.3d at 1476; see also Humana, 2020 U.S. Dist. LEXIS 101378, at *18-*19 (finding no direct

13   evidence of market power because the complaint failed to sufficiently allege evidence of restricted

14   output); Dominick, 2012 U.S. Dist. LEXIS 141950, at *19 (dismissing complaint after finding no

15   direct evidence of market power because the complaint failed to illustrate defendants' ability to

16   affect the market-wide quantity of product by suppressing their own product).  Stated differently,

17   the FAC's alleged direct evidence of market power is not sufficiently detailed "to raise a right to

18   relief above the speculative level."  Rick-Mik Enters., 532 F.3d at 973.

19          2.  Circumstantial Evidence

20          With respect to circumstantial evidence of market power, the issue is a closer call.  As

21   previously discussed, the FAC defines the relevant market as the market for micro-irrigation

22   design services and equipment in (1) Dos Palos-Firebaugh, (2) Patterson-Newman, and (3)

23   Stockton.  Doc. No. 25, ¶¶ 59, 65.  Defendants do not oppose the alleged product market in the

24   FAC, and the Court found above that the geographic markets are sufficiently alleged.  The FAC

25   also alleges that in 2016 before the acquisition, IDC and AVI had about a 60-65% share in the Dos

26

27   [7] The Court recognizes that "a finding of actual harm to competition" may obviate the need for elaborate market
     analysis of reduction of output or predatory pricing.  Oltz v. Saint Peter's Community Hosp., 861 F.2d 1440, 1448 (9th

28   Cir. 1988).  However, as explained in a later section of this Order, the FAC does not sufficiently allege actual harm to
     competition.

13

1  Palos-Firebaugh market, IDC had about a 45% share in the Patterson-Newman market, and IDC

2  had about a 50% share in the Stockton market.  Id., ¶ 76.  While some courts have found

3  percentages in these ranges to be substantial,[8] "[a] mere showing of substantial or even dominant

4  market share alone cannot establish market power."  Rebel Oil, 51 F.3d at 1439.  The plaintiff

5  must also "show that new rivals are barred from entering the market and show that existing

6  competitors lack the capacity to expand their output to challenge the predator's high price."  Id.;

7  SC Innovations, Inc. v. Uber Techs., Inc., 434 F. Supp. 3d 782, 794-95 (N.D. Cal. 2020); see also

8  Pacific Steel Grp. v. Commercial Metals Co., 2021 U.S. Dist. LEXIS 97113, *16 (N.D. Cal. May

9  21, 2021); Dominick, 2012 U.S. Dist. LEXIS 179703, at *12-13.

10     The Court finds that although some of the FAC's entry barrier allegations are plausible,[9]

11  the FAC does not provide sufficient evidence that "existing competitors lack[ed] the capacity to

12

13  [8] The Ninth Circuit has held that a plaintiff need not plead market share with specificity.  See Newcal Indus., 513 F.3d
at 1045 ("There is no requirement that these elements of the antitrust claim be pled with specificity.").  "Courts have
found rough estimates of market share sufficient at the pleading stage."  Alivecor, Inc. v. Apple Inc., 2022 U.S. Dist.

14  LEXIS 49881, at *21 (N.D. Cal. Mar. 21, 2022) (collecting cases); see also Teradata Corp. v. SAP SE, 2018 U.S.
Dist. LEXIS 209872, *55 (N.D. Cal. Dec. 12, 2018) (finding allegation that defendants "possess a market share that

15  ranges, on information and belief, from 60% to 90%" sufficed to plead market power at the motion to dismiss stage).
The Ninth Circuit has advised courts to be "wary of the numbers game of market percentage," and instead consider

16  relevant market factors including "market share, entry barriers and the capacity of existing competitors to expand
output."  Pacific Steel Grp. v. Commercial Metals Co., 2021 U.S. Dist. LEXIS 97113, *16 (N.D. Cal. May 21, 2021).

17  In light of these principles, the FAC's market share allegations based on Plaintiff's experience in, and understanding
of, the relevant markets are sufficient at this stage in the litigation.  While Defendants contend that the FAC's failure

18  to provide current market shares makes it deficient, evidence of declining market shares in the present "may reflect an
absence of market power, but it does not foreclose a finding of such power."  Oahu Gas Serv., Inc. v. Pac. Res., Inc.,

19  838 F.2d 360, 366 (9th Cir. 1988) (citing Greyhound Comput., 559 F.2d at 496 n.18).  The inquiry into Defendants'
current market shares and whether they foreclose a finding of market power is better suited for resolution on the

20  merits rather than during the pleading stage.

21  [9] The FAC sufficiently alleges "entrenched buyer preferences for established brands" as an entry barrier.  Rebel Oil,
51 F.3d at 1439.  Namely, the FAC alleges that new entrants do not have the "same relationships" that IDC, AVI, and

22  other incumbent design firms have with growers.  This lack of established relationships is allegedly a dealbreaker
because growers typically prefer existing design firms with experience over their micro-irrigation systems and because

23  switching to a new firm poses too high a risk to growers, "given the importance of proper irrigation to their crops and
the substantial investments they make in their micro-irrigation systems."  Doc. No. 25, ¶ 78.  Additionally, the FAC

24  alleges that new entrants would have to "find local sales personnel that have or could develop relationships with local
growers" and spend time persuading a grower who previously used IDC or AVI to switch to another design firm.  Id.
Taken together, these allegations plausibly allege entrenched grower preferences for incumbent design firms.  See

25  Sidense Corp. v. Kilopass Tech., Inc., 2015 U.S. Dist. LEXIS 162505, *22 (N.D. Cal. Dec. 2, 2015) (finding that
plaintiff sufficiently alleged that it and defendant were the two significant producers in the relevant market, which

26  allowed for a plausible inference that buyer preferences between the parties were entrenched); see also Aya
Healthcare Servs. v. AMN Healthcare, Inc., 2018 U.S. Dist. LEXIS 102582, *64-*65 (S.D. Cal. June 19, 2018)

27  (finding sufficient allegation of "entrenched buyer preferences for established brands" because plaintiffs alleged that
defendants were highly recognized in the market and that potential entrants must develop a "sufficiently trusted

28  brand" for consumers to hire them).

expand their output to challenge [Defendants'] high price." Rebel Oil, 51 F.3d at 1439; see also

SC Innovations, 434 F. Supp. 3d at 794-95 (finding no circumstantial evidence of market power at

pleading stage in part because complaint did not sufficiently allege that competitor lacked ability

to increase output in response to defendant's contraction); Optronic Techs., Inc. v. Ningbo Sunny

Elec. Co., 2017 U.S. Dist. LEXIS 160238, *25 (N.D. Cal. Sep. 28, 2017) (same).

In *Rebel Oil*, the Ninth Circuit held that a defendant lacked market power despite its

predatory pricing, because its competitors could and did expand their output in the relevant

market. Id. at 1441-42. In reaching its decision, the Ninth Circuit provided the following

guidance:

> Market power cannot be inferred solely from the existence of entry barriers and a
> dominant market share. The ability to control output and prices - the essence of
> market power - depends largely on the ability of existing firms to quickly increase
> their own output in response to a contraction by the defendant. Competitors may
> not be able to increase output if there are barriers to expansion. One such barrier is
> lack of excess capacity. Excess capacity is the capacity of the rivals in a market to
> produce more than the market demands at a competitive price. If existing
> competitors are producing at full capacity, they may lack the ability to quickly
> expand supply and counteract a predatory's supracompetitive pricing. On the other
> hand, if rivals have idle plants and can quickly respond to any predator's attempt to
> raise prices above competitive levels, the predator will suffer an immediate loss of
> market share to competitors. In that instance, the predator does not have market
> power.

Id. at 1441 (internal citations omitted).

Here, the FAC does not allege that Plaintiff or any other competitor in the relevant markets

produced at full capacity or lacked excess capacity when Defendants allegedly increased prices

and reduced quality and output. See id. The FAC also does not allege that competitors other than

Plaintiff, such as Rivulis, Eurodrip, Toro, Irritec, or Rain Bird, were unable to increase output

through other existing design firms.[10] See Optronic Techs., 2017 U.S. Dist. LEXIS 160238, at

*25 (finding that although plaintiff identified other competitors in the supply and distribution

markets, there were no corresponding statements in the complaint explaining why those

participants could not increase their own output in response to a contraction by defendants).

---

[10] The Court is also not persuaded by the FAC's allegations that competing design firms and manufacturers could not efficiently increase output by establishing new firms in new localities. The FAC itself states that IDC and AVI, even before the merger, were not deterred from expanding their store footprints to compete in new territories. Doc. No. 25, ¶¶ 25 n.4, 38. The FAC does not state why IDC and AVI could so easily expand, but other design firms could not.

1    Instead, the FAC alleges that *Plaintiff* attempted but was unable to make up for its loss of sales

2    through IDC and AVI by using other design firms.  Doc. No. 25, ¶ 42.  The FAC also alleges that

3    "[t]he impact of the acquisition on *Netafim's sales* illustrates that entry and expansion was

4    insufficient to counteract the adverse effects of the acquisition."  Id., ¶ 78 (emphasis added).

5    These allegations say nothing about the output capacity of other competitors and contradict the

6    FAC's own statement that Plaintiff's overall sales in Central California increased from 2016 to

7    2018.  Id., ¶ 42.  The FAC does not sufficiently state how or why, after Defendants predatory

8    behavior, Plaintiff allegedly could not increase its output but could increase its overall sales.  Cf.

9    PNY Techs., Inc. v. SanDisk Corp., 2012 U.S. Dist. LEXIS 55965, *30-*31 (N.D. Cal. Apr. 20,

10   2012) (holding that complaint did not show that existing competitors lacked the capacity to

11   increase output because the complaint itself indicated that the plaintiff and other competitors

12   actually increased output in response to the defendant's price increase).  As written, the FAC does

13   not sufficiently allege facts "above the speculative level" that existing competitors lacked the

14   capacity to expand their output post-acquisition.  Rick-Mik Enters., 532 F.3d at 973.

15          In sum, because the FAC does not sufficiently allege that Plaintiff and other incumbent

16   competitors lacked the capacity post-merger to increase their output in the short run, the FAC does

17   not provide sufficient circumstantial evidence that Defendants possessed market power.  Further,

18   the FAC also does not provide direct evidence of market power because it does not sufficiently

19   allege that Defendants restricted market-wide output or imposed market-wide supracompetitive

20   prices.  Accordingly, the Court will dismiss Plaintiff's antitrust claims with leave to amend.

21          **C. Antitrust Injury**

22          *Defendants' Arguments*

23          Defendants argue that the FAC alleges many of the same deficient claims from the original

24   Complaint.  Specifically, Defendants contend that the FAC asserts the same conclusory allegations

25   that the acquisition harmed Plaintiff and the competitive process itself—i.e., led to higher market-

26   wide prices or diminished market-wide product quality for growers.  Defendants also opine that

27   the FAC fails to sufficiently allege that increased market-wide prices or reduced product quality

28   are the cause of Plaintiff's own injury.  Furthermore, Defendants argue that the FAC's allegations

1    regarding the horizontal merger between AVI and IDC do not sufficiently state harm to

2    competition because AVI and IDC were not competitors before the merger in two of the three

3    alleged markets.

4            *Plaintiff's Arguments*

5            Plaintiff contends that the FAC sufficiently alleges an antitrust harm.  Specifically, the

6    FAC alleges that Plaintiff lost sales from growers who were not able to buy Plaintiff's products

7    from AVI and IDC after the acquisition.  The FAC also alleges harm to competition at large in that

8    the merger had the anticompetitive effect of denying growers that rely on AVI and IDC access to

9    micro-irrigation equipment manufactured by Defendants' competitors, including Plaintiff, Rivulis,

10   Eurodrip, Toroc, Irritec, and Rain Bird.  Plaintiff further argues that the acquisition harmed

11   competition in that it eliminated actual and potential horizontal competition between AVI and

12   IDC.

13           *Legal Standard*

14           "A plaintiff may only pursue an antitrust action if it can show antitrust injury, which is to

15   say injury of the type the antitrust laws were intended to prevent and that flows from that which

16   makes defendants' acts unlawful."  American Ad Mgmt., Inc. v. General Tel. Co., 190 F.3d 1051,

17   1055 (9th Cir. 1999) (citing Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334

18   (1990)).  "[A]ntitrust laws are only intended to preserve competition for the benefit of consumers."

19   Id.  "Consumer welfare is maximized when economic resources are allocated to their best use . . .,

20   and when consumers are assured competitive price and quality."  Rebel Oil, 51 F.3d at 1433.

21   Thus, "the antitrust laws are only concerned with acts that harm 'allocative efficiency and raise[]

22   the price of goods above their competitive level or diminish[] their quality.'"  Pool Water Prods. v.

23   Olin Corp., 258 F.3d 1024, 1034 (9th Cir. 2001) (quoting Rebel Oil, 51 F.3d at 1433).

24   "[L]imitation of consumer choice, in itself, does not amount to 'antitrust injury.'"  Somers v.

25   Apple, Inc., 729 F.3d 953, 966 (9th Cir. 2013); see also Hirsh v. Martindale-Hubbell, Inc., 674

26   F.2d 1343, 1349 n.19 (9th Cir. 1982) ("[I]ntru[sion] upon consumers' freedom of choice by

27   compelling the purchase of unwanted products . . . has been implicitly rejected by the Supreme

28   Court as a sufficient independent basis for antitrust liability.").

"The requirement that the alleged injury be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged male-factors." Association of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc., 241 F.3d 696, 704 (9th Cir. 2001) (citing Bhan v. NME Hosps., Inc., 772 F.2d 1467, 1470 (9th Cir. 1985)).  "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris, Inc., 185 F.3d 957, 966 (9th Cir. 1999) (citing Eagle v. Star-Kist Foods, Inc., 812 F.2d 538, 540 (9th Cir. 1987)).  If the movant is a competitor, then it "must demonstrate injury to competition in the market as a whole, not merely injury to itself as a competitor." Gorlick Distribution Ctrs., Ltd. Liab. Co. v. Car Sound Exhaust Sys., 723 F.3d 1019, 1024-25 (9th Cir. 2013).  To plead injury to competition sufficiently to withstand a motion to dismiss, the "claimant must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail." Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1198 (9th Cir. 2012) (citing Les Shockley Racing, Inc. v. National Hot Rod Ass'n, 884 F.2d 504, 508 (9th Cir. 1989)).  Such allegations must "raise a reasonable expectation that discovery will reveal evidence of" an injury to competition.  Id.  An allegation of a practice that may or may not injure competition is insufficient to "state a claim to relief that is plausible on its face." Id.

   *Discussion*

   The Court previously dismissed the original Complaint in part because it did not sufficiently allege that consumers (i.e., growers) and competing manufacturers suffered actual harm as a result of the merger.  The Court stated that Plaintiff "fail[ed] to allege a single instance in which, as a result of the merger, a single grower was prevented from purchasing a single piece of micro-irrigation equipment," and that "the only substantive allegation involving a post-acquisition consumer describes a cantaloupe grower switching from Netafim to Jain, which if anything implies enhanced consumer welfare."  Doc. No. 20 at 18.  Additionally, the Court stated that Plaintiff's references to reduced competition between design firms and higher costs for non-Jain manufacturers to compete did not demonstrate harm to consumers.  Id. at 18-19.

1   Upon review, the Court finds that the FAC does not cure the aforementioned deficiencies.

2   In an attempt to cure the flaws of the original Complaint, the FAC alleges in relevant part that

3   "post-acquisition, growers that relied on IDC and AVI no longer had a competitive choice of

4   micro-irrigation products."  Doc. No. 25, ¶ 35.  That is, "growers could no longer purchase

5   products from Netafim or other leading suppliers such as Rivulis, Eurodrip, Toro, Irritec, and Rain

6   Bird," and this arrangement caused growers harm because they "could only purchase Jain products

7   that were higher price or lower quality than what they otherwise would have purchased."  Id.

8   Additionally, the FAC alleges that the acquisition harmed competition by eliminating "actual and

9   potential competition" between IDC and AVI themselves, Id. at ¶ 39, and by decreasing Plaintiff's

10  Central California sales by approximately $5 million in 2018.  Id. at ¶ 42.  The Court is not

11  persuaded that these allegations cure the deficiencies of the original Complaint.

12      The FAC does not sufficiently sketch an outline of injury to competition with "allegations

13  of supporting factual detail."  Brantley, 675 F.3d at 1198.  Like the original Complaint, the FAC

14  provides conclusory references to increased prices and reduced quality without factual allegations

15  suggesting that growers suffered harm as a result of the merger.  See GSI Tech. v. United

16  Memories, Inc., 2014 U.S. Dist. LEXIS 54371, *9 (N.D. Cal. Apr. 18, 2014) (holding that plaintiff

17  pleaded no facts, such as reduced output, rising prices or deteriorating quality, to demonstrate

18  detrimental impact on the market).  The FAC alleges that "growers that relied on IDC and AVI no

19  longer had a competitive choice of micro-irrigation products" such as those from Plaintiff, Rivulis,

20  Eurodrip, Toro, Irritec, and Rain Bird.  However, "limitation of consumer choice, in itself, does

21  not amount to 'antitrust injury.'"  Somers, 729 F.3d at 966.  The FAC again provides a single

22  substantive allegation describing a cantaloupe grower switching from Plaintiff to Jain, and states

23  that this grower "suffered anticompetitive harm because it was unable to obtain the Netafim

24  products that it preferred and had bought in the past, instead having to purchase Jain products that

25  it chose not to purchase when competitive alternatives were available."  Doc. No. 25, ¶ 43.  But

26  this allegation again does not address the implication that the switch, if anything, enhanced

27  consumer welfare, as the grower could have opted out for a different design firm selling non-Jain

28  products but chose not to.  The FAC does not contain sufficient factual details suggesting that the

19

cantaloupe grower or others suffered higher costs and lower qualify from Defendant's products after the acquisition.  See Zef Sci., Inc. v. Shimadzu Sci. Instruments, Inc., 2016 U.S. Dist. LEXIS 44123, *13 (S.D. Cal. Mar. 31, 2016) (dismissing the complaint's antitrust allegations as speculative because they did not provide any factual allegations to show how consumers were injured by the defendant's conduct but instead merely states legal conclusions of allegedly unlawful and anti-competitive conduct by defendant).

Moreover, while the FAC alleges injury to Plaintiff as a competitor, it does not sufficiently "demonstrate injury to competition in the market as a whole."  Gorlick Distribution Ctrs., 723 F.3d at 1024-25; see also Oregon Laborers, 185 F.3d at 966 ("The antitrust laws . . . were enacted for the protection of competition, not competitors."); Siegler v. Sorrento Therapeutics, Inc., 2019 U.S. Dist. LEXIS 23779, *34-35 (S.D. Cal. Feb. 12, 2019) (holding that "[n]othing in Plaintiff's FAC alleges an injury to competition in general. Instead, all of her allegations focus on the impact of defendants' anti-competitive conduct—as it relates to her.").  The decrease in Plaintiff's market share, though substantial, is an affect to a competitor, not to competition.  Pool Water Prods., 258 F.3d at 1036.  Although the FAC alleges that Rivulis, Eurodrip, Toro, Irritec, and Rain Bird suffered harm as a result of IDC and AVI's removal of their products, the allegations are conclusory and do not state, like the FAC does for Plaintiff, that these competitors were unable to recoup any lost sales through their business relationships with other design firms.

Furthermore, the FAC's allegation that the merger harmed competition by eliminating *potential* competition between IDC and AVI is unavailing because an allegation of a practice that "*may or may not* injure competition is insufficient to 'state a claim to relief that is plausible on its face.'"  Brantley, 675 F.3d at 1198 (emphasis added).  In two of the three alleged markets— Patterson-Newman and Stockton—the FAC admits that IDC and AVI were not head-to-head competitors but that they were likely to directly compete in the future.  Doc. No. 25, ¶ 38.  In the remaining market—Dos Palos-Firebaugh—the FAC alleges actual competition between IDC and AVI but does not provide sufficient factual details.  These allegations do not sufficiently state that the merger harmed competition.  Therefore, the Court will dismiss Plaintiff's antitrust claims with leave to amend.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.  Defendants' motion to dismiss the Complaint (Doc. No. 34) is GRANTED in part and DENIED in part as discussed above.

2.  Plaintiff may file an amended complaint that is consistent with this order no later than twenty-one (21) days from service of this order;

3.  If Plaintiff files an amended complaint, Defendants shall file a response within twenty-one (21) days of service of the amended complaint; and

4.  The failure of Plaintiff to file a timely amended complaint will result in the withdrawal of leave to amend without further notice, and Defendants shall file an answer within twenty-eight (28) days of service of this order.

IT IS SO ORDERED.

Dated:   July 15, 2022

_____

SENIOR  DISTRICT  JUDGE